Valentina A. NAGOULKO, Petitioner,

v.

IMMIGRATION and
NATURALIZATION SERVICE,
Respondent.

No. 02–70467.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 2003.

Filed June 24, 2003.

---

Daniel Hoyt Smith, MacDonald, Hoague, and Bayless, Seattle, Washington, for the petitioner.

Robert D. McCallum, Jr., Assistant Attorney General, Civil Division; Mark C. Walters, Assistant Director; and Margaret Perry, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: LAY,* GOODWIN, and GOULD, Circuit Judges.

GOULD, Circuit Judge.

Petitioner Valentina Nagoulko is a 42 year old female native and citizen of the Ukraine. She entered the United States in October 1994 as a non-immigrant visitor. When her visa expired on March 31, 1995, she remained in the United States and filed an asylum application with the INS. The asylum application was denied on May 18, 1995. The INS then placed Nagoulko in deportation proceedings. Nagoulko conceded deportability, but she applied for relief from deportation in the form of asylum, 8 U.S.C. § 1158, and withholding of deportation, 8 U.S.C. § 1253(h).

After an evidentiary hearing, which was held on April 10, 1996, the Immigration Judge (IJ) issued a decision on January 9, 1997,[1] finding Nagoulko's testimony to be credible but nevertheless determining that Nagoulko was ineligible for asylum and withholding of deportation.[2] The IJ reasoned that although Nagoulko demonstrated a subjective fear of persecution, she could not show her fear was objectively reasonable. On appeal, the Board of Immigration Appeals (BIA) issued a per curiam decision on February 27, 2002, adopting the reasoning of the IJ and dismissing the appeal.[3] Nagoulko timely petitions for review. We have jurisdiction, 8 U.S.C. § 1105a(a) as amended by IIRIRA § 309(c)(4), and we deny the petition.

## I

Nagoulko alleges past persecution by the Communist party and Communist sympathizers in the Ukraine because of her Pentecostal Christian beliefs and active involvement in the Pentecostal Church. Only Nagoulko testified at the

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The IJ's oral decision was initially issued on April 12, 1996. Nagoulko's attorney failed to appeal. Upon motion from Nagoulko's new counsel, the IJ reissued the same decision on January 9, 1997 to afford Nagoulko an opportunity to file a timely appeal through her new counsel.

2. Nagoulko does not petition for review of the IJ's decision regarding withholding of deportation and we therefore need not address it.

3. Because the BIA expressly adopted the IJ's decision, we review the IJ's decision. *Lata v. INS*, 204 F.3d 1241, 1244 (9th Cir.2000).

evidentiary hearing before the IJ. She testified as follows:

Nagoulko was born in the Ukraine in 1960 while the country was under Soviet Communist rule. Her mother was a member of the Pentecostal Christian faith and Nagoulko was raised as a Pentecostal. As a child she was pressured to join the Young Communist League but refused because of her religious beliefs. She was also persistently teased and discriminated against by teachers and other students because of her religion. Nevertheless, Nagoulko got a high school education and became a kindergarten teacher.

In 1980, at the age of 20, while she was employed as a kindergarten teacher, Nagoulko was baptized during a secret ceremony at a lake. The baptismal ceremony was secret because the country was still under Communist rule and the Church could not obtain permission to perform the baptismal ceremony. As Nagoulko testified through an interpreter, the ceremony was interrupted by militia who "came in and they just interfere in our, in the baptize process and they drown old people all over, but they finished and I actually got, I was baptized." Neither Nagoulko's counsel nor the government's counsel explored what Nagoulko meant by "drown." Further, Nagoulko did not mention any drowning in her application for asylum. Nor was there any other testimony about drownings causing loss of life.

A few days after her baptism, Nagoulko was interrogated at work, was pressured to "finish with her religion" and become a member of the Communist party, and was then fired for her refusal to stop practicing her religion. Her employers threatened her and "told [her] that they can finish[ ] [her] and they told [her] that they can send some people to finish[ ] [her]." Also, Nagoulko's father was threatened by the KGB because of Nagoulko's baptism.

After Nagoulko was fired from her job as a kindergarten teacher, she obtained work in a furnace factory. While working at the factory from 1981 to 1988, Nagoulko was harassed because of her religion by a coworker who told her he would stage a job accident and get Nagoulko sent to jail. Nagoulko quit her job at the factory in 1988 because of the "constant threat and constant harassment."

During the 1980s, while working at the furnace factory, Nagoulko attended weekly church services held in private residences. In 1983 or 1985, the police disrupted one service in a private home, used "vulgar force" to stop the service, and arrested the preachers. Some of Nagoulko's friends were severely beaten. Nagoulko was not beaten. But the police pushed her, causing her to fall down, and took her handbag. At another service, the police came in, tried to stop the service, and insulted and pushed the attendees. Though relating these two instances of "pushing," Nagoulko testified she was never arrested and she was never beaten.

In 1991, the Ukraine gained its independence when the Soviet Union disbanded. The new central government enacted legislation that guaranteed freedom of religion and permitted religious organizations to establish public places of worship. Nagoulko started working for the Good Samaritan Mission doing full-time religious work. She co-authored a Christian journal and worked on radio and television broadcasts. She went on trips to Israel (in 1993) and Germany (in 1991) on group visas with members of the Church to "get familiar with biblical places." She did not seek asylum in either of these countries.

During the summer of 1991, the Mission was visited by local government officials who threatened those at the Mission and said that the government would "finish[ ]

with [them]." One sympathetic government officer warned the workers that the government kept a list of people who worked at the Mission, and that "all workers who worked for the mission were first on that list to be arrested." Nagoulko feared for her life because she knew that under the Communist regime, members of the Pentecostal Church died in concentration camps and one woman was sent to Siberia for 25 years.

In 1994, local government officials ordered the Mission to stop publishing its Christian journal. During 1994, the Mission was also forbidden from recruiting members or converts at schools or jails, and church services were often interrupted by local government officials or "just simply hooligans." To Nagoulko, these were signs that the "the spirit of the communism [was] born, born again." She suspected that the phones at the Mission were tapped. In the spring of 1994, an official came to an evangelical meeting and told the people that "our time is coming ... we will kill all of you, shoot all of you." At another time, unidentified people shouted outside Nagoulko's residence in the middle of the night, saying "we will be back and we will torture you and you will[ ] suffer from our actions, we will finish[ ] you." And, finally, at one time when Nagoulko was visiting her childhood home town in 1994, she was stopped by a "hooligan" who "just simply want[ed] to kill [her]." Though people at the Mission complained to the police about the hooligans, the government did not take measures to stop them. Nagoulko suspects that "the government and all those hooligans had a connection between each other and ... that the government hired those people to interfere, to interrupt our meetings, our services, and to do something against us."

In 1995, after Nagoulko had left the Ukraine, the Mission was told that it could no longer rent the office space that it was using. The television and radio station temporarily had to stop broadcasting from September 1995 until February 1996. Nagoulko believes that this happened because the Communist party was and is regaining power incrementally in the Ukraine. On cross-examination, Nagoulko admitted that the temporary stop in broadcasting could have been due to economic problems because the government had increased the cost of air time. The Mission still continues to conduct church services. Nagoulko's brother and parents still attend church.

At the heart of Nagoulko's concerns, she does not want to return to the Ukraine because she fears that the Communist party will regain power and kill her: "I just don't want to go there because what I think, if I, if I go back to Ukraine and if the communist will take power over and will take over the government, they will just finished me, that's all." On cross-examination, when asked whether her "greatest fear is that the communist[s] will come back into control," Nagoulko responded "Yes."

## II

▪ Nagoulko's testimony is presumed to be true because the IJ accepted the testimony as credible. *See Shoafera v. INS,* 228 F.3d 1070, 1073 (9th Cir.2000). The BIA's denial of asylum is reviewed for substantial evidence, even in cases where the IJ accepts the applicant's testimony as credible. *See id.* at 1073. We will "reverse the BIA's decision that an applicant is ineligible for asylum only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed." *Chand v. INS,* 222 F.3d 1066, 1073 (9th Cir.2000) (internal quotations omitted).

▪ To establish eligibility for asylum, Nagoulko must show that she is "un-

able or unwilling to return to[her] home country because of a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." *Duarte de Guinac v. INS,* 179 F.3d 1156, 1159 (9th Cir.1999) (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 428, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). An alien's "well-founded fear of persecution" must be both subjectively genuine and objectively reasonable. *Id.* Nagoulko satisfies the subjective component by credibly testifying that she genuinely fears persecution. *See id.* To satisfy the objective component, Nagoulko must show that she has suffered from past persecution (which then gives rise to a rebuttable presumption of future persecution) or that she has a "good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Id.*

▇▇▇ Persecution is "the infliction of suffering of harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Korablina v. INS,* 158 F.3d 1038, 1043 (9th Cir.1998) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 489, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). Persecution, however, is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Id.* at 1044 (internal quotation omitted). There is no doubt that Nagoulko was teased, bothered, discriminated against and harassed because of her Pentecostal religious beliefs. The record, however, does not *compel* a conclusion that Nagoulko suffered from past persecution.

The standard for persecution is more demanding. Though Nagoulko's religious practice and work was not free from interruption or harassment, she was not prevented from practicing her religion. Nagoulko attended weekly church services, albeit in private residences, while the Communist party was still in power in the 1980s. When the Ukraine was liberated in 1991, Nagoulko worked full-time at a mission to spread her religious faith; she authored a Christian magazine and worked on radio and television broadcasts.

That Nagoulko was fired from her job as a kindergarten teacher because of her religious beliefs, while discriminatory, is not the type of economic deprivation that rises to the level of persecution. Nagoulko found steady work at the furnace factory for seven years after she was fired from her teaching job. And she eventually was able to work at a mission contributing directly to her religious community in a job that she apparently embraced and enjoyed. *Cf. Matter of Acosta,* 19 I. & N. Dec. 211 (BIA 1985) (recognizing that "economic deprivation or restrictions so severe that they constitute a threat to an individual's life or freedom" may constitute persecution), *overruled on other grounds by Matter of Mogharrabi,* 19 I. & N. Dec. 439 (BIA 1987). *See also Chand,* 222 F.3d at 1074 (finding past persecution where, in addition to physical abuse, applicant and his family were repeatedly robbed and forced to vacate their home); *Gonzalez v. INS,* 82 F.3d 903, 910 (9th Cir.1996) (finding past persecution where, in addition to violence committed against the applicant's family and threats made to her, family land had been seized and the applicant's ration card and her business's ability to buy inventory were taken away).

In the precise circumstances of this case, it is significant that Nagoulko never suffered any significant physical violence. Unlike in other cases where we have held that the record compels a finding of past persecution, Nagoulko was never physically harmed. *See Duarte,* 179 F.3d at 1162 (refusing to affirm the BIA's determination that the applicant had only suffered

discrimination when the applicant was repeatedly beaten by members of the national military on account of his race); *Korablina*, 158 F.3d at 1045 (rejecting the idea that Korablina was subject to nothing more than discrimination given that Korablina had been "robbed and attacked, tied to a chair with a noose around her neck and threatened with death," and given that she had to seek medical treatment for a brain concussion from being struck in the head with a blunt instrument). *See also Prasad v. INS*, 47 F.3d 336, 339–40 (9th Cir.1995) (no reasonable factfinder would be compelled to find past persecution when the applicant was stopped at a roadblock, arrested, beaten and detained for several hours but when he did not require medical treatment and there was no evidence that the government had a continuing interest in the applicant); *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir.2000) (finding past persecution when applicant was arrested and tortured by police for three days with beatings and electric shock because of his political opinion); *Chand*, 222 F.3d at 1073–74 (past persecution when applicant was attacked and beaten by Fijian soldiers on three occasions, applicant's father was beaten to death, and applicant was robbed and forced to vacate his home). The recital of two occasions where Nagoulko was "pushed" while attending church services interrupted by government officials does not compare to the severity of physical abuse that in other cases we have deemed persuasive to show persecution.

█ And, while acts of violence committed against an applicant's friends or family can establish well-founded fear of persecution, *Korablina*, 158 F.3d at 1044, that Nagoulko witnessed the beating of some of her co-workers does not compel a factfinder to conclude that Nagoulko suffered from past persecution. *Cf. id.* at 1042–43, 1045 (taking into account that Korablina had witnessed repeated violent attacks in which her boss was robbed, beaten, and then disappeared; one of her friends who worked at the municipal city hall disappeared after he promised to help end the ongoing harassment; her husband was brutally beaten and her daughter was beaten and threatened with rape when the attackers could not locate the whereabouts of Korablina).[4]

4. Nagoulko testified that her baptismal ceremony was interrupted by militia, who "came in and they just interfere in our, in the baptize process and they drown old people all over, but they finished and I actually got, I was baptized." We accept Nagoulko's testimony as truthful absent explicit findings to the contrary by the IJ. *Shoafera*, 228 F.3d at 1073. However, we conclude that accepting the asylum applicant's testimony as truthful does not preclude an assessment of the intended meaning of her language or tie the hands of logic by requiring us to accept a literal meaning where the context of the record and the actions of the applicant unambiguously indicate that a non-literal meaning must have been intended.

Thus, we do *not* read the record to indicate that there occurred a wholesale mass murder of old persons attending the secret baptismal ceremony. First, to so conclude does not in context of Nagoulko's testimony make any sense, for it is simply not possible that Nagoulko's baptism ceremony continued if people were killed during the ceremony. To the contrary, human experience tells us that after a mass murder, such an important religious ceremony could not have been routinely and immediately resumed. Second, Nagoulko's counsel at the hearing before the IJ did not explore the issue of drownings. Third, Nagoulko did not elaborate at the evidentiary hearing, nor did she assert that there were actual drownings in her asylum application. *Cf. Navas v. INS*, 217 F.3d 646, 652 n. 3 (9th Cir.2000) (accepting facts mentioned in asylum applicant's testimony as true even though those facts were not included in the asylum application when the record as a whole demonstrated that the applicant misunderstood the questions on the asylum application and neglected to include relevant facts because he thought those facts would actually hurt his chances for asylum). In our view a literal

This case like many others turns on the standard of review. Perhaps the IJ could have found past persecution on this record, but unlike in *Duarte* or *Korablina,* the IJ was not compelled to find past persecution. Thus, we face no presumption of future persecution.

In addition, Nagoulko has not otherwise shown good reason to fear future persecution. *See Duarte,* 179 F.3d at 1159. Nagoulko testified that her greatest fear in returning to the Ukraine is that the Communist party will regain power and kill her on account of her religious beliefs. She has submitted no specific evidence to suggest that the Communist party will regain power in the Ukraine. Though changes of government are always possible in any country, on the record before us, this possibility is too speculative to be credited as a basis for fear of future persecution. This conclusion is reinforced by the January 1995 Country Report of Ukraine submitted to the IJ, which does not support the likelihood of Ukraine's return to Communism that Nagoulko fears. While we fully accept that Nagoulko's fear of future persecution is subjectively genuine, it is not objectively reasonable under the circumstances of this case.

Because Nagoulko cannot show that she has suffered from past persecution, and because she cannot show good reason to fear future persecution, she is not eligible for asylum relief.

**PETITION DENIED.**

---

reading of Nagoulko's translated testimony that the militia "drown old people all over" is not warranted in light of the record as a whole, including Nagoulko's failure to assert the "drownings" as a basis for her asylum application or otherwise to explain this dramatic event in her testimony.

---

Considering Nagoulko's statement in the context of her testimony and her asylum claim, we need not decide whether Nagoulko would have been eligible for asylum relief if there were actual drownings in the sense of a murder of persons attending the baptism.