**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LIOUDMILA G. KROTOVA; ANASTASIA
KROTOVA; ALEKSANDRA KROTOVA,
          *Petitioners,*

          v.

ALBERTO R. GONZALES, Attorney
General,
          *Respondent.*

No. 04-70806

Agency Nos.
A76-853-686
A76-853-817
A76-853-818

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 17, 2005—Seattle, Washington

Filed August 4, 2005

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber

**COUNSEL**

Angela Bortel and Christopher A. Kerosky, Kerosky & Associates, San Francisco, California, for the petitioners.

Jennifer Keeney, United States Department of Justice, Washington, D.C., for the respondent.

**OPINION**

GRABER, Circuit Judge:

Lead Petitioner Lioudmila Krotova and her daughters, Anastasia Krotova and Aleksandra Krotova, who are all natives and citizens of Russia, petition for review of a final order of removal by the Board of Immigration Appeals ("BIA"). The BIA denied their applications for asylum and withholding of removal because it concluded that Petitioners had failed to demonstrate that the harassment, discrimination, and violence experienced by the lead Petitioner on account of her being Jewish rose to the level of persecution. We have jurisdiction under 8 U.S.C. § 1252, and we grant the petition for review.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioners entered the United States in 1994. They first applied for asylum and withholding of removal in 1998. In 2002, they were charged with removability for overstaying

their visas. They conceded removability and requested asylum, withholding of removal, relief under the Convention Against Torture and, in the alternative, voluntary departure.

At the hearing before the immigration judge ("IJ"), the lead Petitioner was the only witness. She is a 54-year-old woman from the far eastern regions of Russia, specifically the Amurskaya, Primorskiy, and Magadon areas. Her mother was Jewish, so her Russian birth certificate lists her "nationality" as Jewish.

Petitioner testified to a history of economic discrimination because of being Jewish. Although she was trained as a meteorologist at a technical college, she was placed in unskilled positions because the best jobs were reserved for ethnic Russians. She was sexually harassed by a supervisor and, when she complained to another supervisor, he told her that "whenever there is Jews in the company, there always is some problem [that] arise[s]" and that she should resolve the situation by herself. At a different job, she learned from coworkers that her supervisor had denied her promotions and salary increases because she is Jewish.

Similarly, her children were denied spaces in state-sponsored day care. The president of the workers' union told her that the vacancies would be taken instead by ethnic Russians.

Although there were few Jews in the areas of Russia where she lived, Petitioner tried to practice her religion. When she lived in the Amurskaya region, she and some other Jews found an abandoned building, minimally restored it, and used it as a synagogue where they could worship together. On several occasions, "the walls of [the] synagogue were painted with sentences such as kikes mugs get out of here." Another time, when Petitioner and fourteen others had gathered at the synagogue, a group of people dressed entirely in black (a uniform that Petitioner recognized as common to "skinheads or

nazis") burst in with "baseball bats and other objects and started breaking windows." Petitioner and six other members of the congregation were able to escape, but the rest were beaten.

The attack was reported to the police. The police first attributed it to "hooligans" and detained two people. Ultimately, however, the police told Petitioner's group "that it is our problems and we should sort them out on our own." After the attack, the synagogue closed and "nobody gathered any more because it was very scary," especially for those who brought their children.[1]

Petitioner was targeted personally on two occasions. In December 1993, she was walking her 9-year-old daughter home from school at six in the evening, in the dark. When Petitioner and her daughter approached their apartment building, a group of people surrounded them and began yelling "zit mug" (which translates as "kike") and "you're still not out of here." When the people began to assault Petitioner by pulling at her clothes, she told her daughter to run for help. This move made her assailants angry and they started to push Petitioner. One person kicked her, leaving a large bruise.

The incident terrified Petitioner, and she began to have nightmares. She reported the incident to the police, but they would not accept her complaint because she did not recognize her attackers nor, because of the dark, could she describe them with particularity.

Then, in 1994, just before Petitioners left Russia, some friends of a skinhead neighbor surrounded her at the entrance to her building:

> [T]hey started telling me so you're still here kike mug. The whole entrance is stinking with your kike

---

[1]Petitioner now attends a synagogue in the United States.

> smell. I tried to ask them what did I do to you and
> it ended with them pushing me, one just struck me
> over the face and actually broke my lip.

Again, Petitioner reported the incident to the police. This time she described the assailants, but even so the police never responded.

Petitioner testified that when she and her then-husband and daughters came to the United States in 1994, she considered the move temporary and hoped to rejoin her family in Russia if conditions improved. She decided to apply for asylum in 1997, after her mother told her that a close friend of the family had been beaten to death in his store after having being assaulted by people who screamed that "this is not a place for Jews [and] that they should get out." Other bad news continued to come from her family in Russia. In 2000, Petitioner's brother was beaten severely by skinheads, and his car was burned; he required surgery to correct damage to his hip that was caused by the beating. Petitioner's sister told her that anti-Semitic flyers commonly are left in the lobby of her apartment building. And, in 2002, Petitioner's sister reported that skinheads had attacked a Jewish school in her city.

Documentary evidence in the record provided a context for Petitioner's testimony. For example, the 2001 Country Report noted that "Jews continued to face prejudice and social discrimination." The Report described numerous incidents in which "unknown persons vandalized Jewish synagogues, cemeteries, and memorials." Very few of the incidents resulted in arrests by the Russian police.[2] The Country Report also referred to "numerous other anti-Semitic incidents" across the country and described, as an example, three violent assaults in a single month by skinheads against Jews.

---

[2] The November 1997 Profile of Asylum Claims noted that, in all but one of the incidents of vandalism against Jewish institutions in 1996 and early 1997, no suspects had been identified.

The IJ denied relief, finding Petitioner "generally credible as to her education and background" but not credible "concerning her persecution on account of her ethnic background, that of being Jewish." The IJ based her adverse credibility determination on Petitioner's failure to mention two incidents of harassment in her application and during her interview with the asylum officer, even though the incidents in fact were described in the declaration that she filed in support of the application. The IJ also found, in the alternative, (1) that the harm experienced by Petitioner did not rise to the level of persecution; and (2) that there was "no evidence that the government could not control or has not tried to control these criminals." For those three reasons, the IJ denied Petitioners' applications for asylum and found that they also failed to meet the higher burdens for withholding of deportation and relief under the Convention Against Torture.[3]

The BIA affirmed on the sole ground that "[t]he incidents described by [Petitioner], including episodes of verbal insults and slurs, an attempted attack consisting of a slap in the face, are consistent with incidents of discrimination, but have not been shown to rise to the level of persecution." This timely petition for review followed.

## STANDARD OF REVIEW

When the BIA conducts an independent review of the IJ's findings, as it apparently did here, we review the BIA's decision and not that of the IJ. *Kankamalage v. INS*, 335 F.3d 858, 861 (9th Cir. 2003). We review the BIA's denial of asylum for substantial evidence, and we may grant the petition only if the record compels a contrary result. *See Nagoulko v. INS*, 333 F.3d 1012, 1015-16 (9th Cir. 2003).

---

[3]Petitioners do not appeal the denial of their application for relief under the Convention Against Torture.

The BIA did not address the IJ's negative credibility finding. When the BIA's decision is silent on the issue of credibility, despite an IJ's explicit adverse credibility finding, we may presume that the BIA found the petitioner to be credible, *Maldonado-Cruz v. INS*, 883 F.2d 788, 792 (9th Cir. 1989); *Damaize-Job v. INS*, 787 F.2d 1332, 1338 (9th Cir. 1986), and we so presume here. That presumption is particularly reasonable here, because the IJ's adverse credibility finding is not supported by substantial evidence.

## DISCUSSION

**[1]** In concluding that the lead Petitioner had suffered only discrimination, the BIA summed up her experience as "including episodes of verbal insults and slurs [and] an attempted attack consisting of a slap in the face." That description inaccurately minimizes Petitioner's experience. Against a background of anti-Semitic harassment and economic and social discrimination against her, and in Russia generally, Petitioner experienced three violent assaults (one occurring at a synagogue and one involving her 9-year-old daughter), the murder of a close family friend, and the severe beating of her brother —all perpetrated by anti-Semitic groups. Those experiences are not consistent with mere discrimination but, instead, compel a finding of past persecution.

**[2]** Persecution is "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Korablina v. INS*, 158 F.3d 1038, 1043 (9th Cir. 1998) (internal quotation marks omitted). It is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Id.* at 1044 (internal quotation marks omitted). Even when a single incident does not rise to the level of persecution, "the cumulative effect of several incidents may constitute persecution." *Surita v. INS*, 95 F.3d 814, 819 (9th Cir. 1996); *see also Korablina*, 158 F.3d at 1044 ("The key question is whether, looking at the

cumulative effect of all the incidents a petitioner has suffered, the treatment she received rises to the level of persecution.").

**[3]** We assessed the cumulative effects of mistreatment on religious grounds in *Korablina* and in *Nagoulko*. *Cf. Singh v. INS*, 134 F.3d 962, 967-68 (9th Cir. 1998) (noting that comparing similar cases is "perhaps [the] best" way to answer the heavily fact-dependent question whether mistreatment rises to the level of persecution). In *Korablina*, we held that the cumulative effect of economic disadvantage and the severe anti-Semitic violence and threats that a Ukranian woman had experienced and witnessed, with increasing frequency in the time before her flight, compelled a finding of past persecution. 158 F.3d at 1044-45. In *Nagoulko*, by contrast, we distinguished *Korablina* and held that, although a Ukrainian woman had been "teased, bothered, discriminated against and harassed because of her Pentecostal religious beliefs," the record did not compel a finding of past persecution. *Nagoulko*, 333 F.3d at 1016. Similarly, in *Halaim v. INS*, 358 F.3d 1128, 1132 (9th Cir. 2004), we held that a finding of past persecution was not compelled where the petitioners had suffered repeated insults from private parties and disruptions of worship by police, but had been able to secure long-term employment and were not bothered at all during the last decade of their residence in the Ukraine.

**[4]** Unlike in *Nagoulko* and *Halaim*, we cannot meaningfully distinguish the cumulative effect of Petitioner's experiences from that in *Korablina*. The sustained economic pressure that Petitioner suffered, the nature and extent of the physical violence that she experienced, and the effect of that violence on restricting Petitioner's ability to practice her religion are the keys to our decision. We need not decide whether any one of those factors, alone, rises to the level of persecution, because their cumulative effect persuades us that a finding of past persecution is compelled.

In *Korablina* and *Nagoulko*, we noted the presence of economic disadvantages that the petitioners experienced because

of their religions, although those disadvantages did not control our decisions. *Cf. Zhang v. Gonzales*, 408 F.3d 1239, 1247 (9th Cir. 2005) ("Our case law clearly establishes that deliberate imposition of substantial economic disadvantage can amount to persecution."). In *Korablina*, although we relied mainly on the anti-Semitic threats and violence that the petitioner suffered, we also commented that the petitioner was "refused admission to the institute of her choice, encountered obstacles to career advancement," and was fired from one job because she was Jewish. 158 F.3d at 1045. By contrast, the economic disadvantages suffered by the petitioner in *Nagoulko* were not sufficient to support her claim of persecution. *See* 333 F.3d at 1016 (finding the economic deprivation caused by being fired from one job insufficient, because the petitioner later found long-term employment, including a position performing religious work that she "embraced and enjoyed"). Here, the lead Petitioner was able to secure education and employment, but it consistently was of a lower quality, and her advancement was purposefully impeded, because she is Jewish. Moreover, in addition to testifying that she was denied raises and promotions and subjected to sexual harassment without recourse, she testified that her husband consistently had trouble finding employment, and advancing in it, because of her religion. Denial of childcare because she is Jewish also contributed to the economic disadvantages that Petitioner suffered over a period of many years. Under *Korablina*, this sustained economic pressure is a factor to consider in combination with the other hardships that Petitioner suffered, most notably physical violence and threats.

In terms of physical severity alone, the violence suffered by Petitioner—a kick, a punch, and some pushing—falls somewhere in between that found in *Korablina* and *Nagoulko*. In *Korablina*, the petitioner was targeted personally only once, in a horrific incident in which two men attacked her, tied her to a chair, and put a noose around her neck, causing her to suffer a concussion. 158 F.3d at 1042. In *Nagoulko*, the peti-

tioner twice was pushed, along with other congregants, when police interrupted a worship session. 333 F.3d at 1014.

**[5]** When we consider the context of the assaults on Petitioner, however, they are much more similar to the assault in *Korablina*. Twice, Petitioner was surrounded by groups of people yelling slurs and threats at her, then pushing and kicking or hitting her. Once she was alone, and another time her young daughter was accosted along with her. Twice she was injured, once in the face. The individualized nature of the assaults and the danger to Petitioner's daughter are relevant to the seriousness of the attacks and the level of fear and mental suffering that they caused.[4]

Moreover, as in *Korablina*, the attacks were occurring with increasing frequency during the time before Petitioner left Russia. *See* 158 F.3d at 1045. The petitioners in *Halaim*, by contrast, had not experienced any harassment for ten years before coming to the United States. 358 F.3d at 1132. And, even more significantly, as in *Korablina*, 158 F.3d at 1045, people close to Petitioner experienced increasingly violent

---

[4]Parallels also can be drawn between Petitioner's case and *In re O-Z & I-Z*, 22 I. & N. Dec. 23, 24-26 (B.I.A. 1998). In that case, the BIA found that a father and son had been persecuted, and not merely subjected to discrimination and harassment, by anti-Semitic groups in Ukraine. The father had been beaten twice—once requiring stitches in his face and another time causing a rib injury. The attackers shouted that he should leave Ukraine and began to send anti-Semitic leaflets to his home. Once, they vandalized his home. In a final incident, he was insulted and pushed to the ground while waiting for a bus; when his young son came to his aid, the son was picked up and dropped on the pavement, injuring his knee badly enough to require surgery. The son was tormented at school. Although the father reported the beatings and the vandalism to the police, no action was taken.

Again, in purely physical terms, the violence against the father was more severe than that against Petitioner. Also, the son was significantly implicated, having been injured by one set of attackers and beaten by his classmates. But the ongoing pattern of anti-Semitic violence and harassment strikes us as very close to that experienced by Petitioner.

anti-Semitic attacks after she left Russia, including the death of a close friend and the severe beating of her brother.

[6] In addition to the economic pressure and physical violence against Petitioner, her inability to practice her religion is significant. In *Nagoulko*, the petitioner's continued ability to worship was one of our principal reasons for concluding that a finding of religious persecution was not compelled. *See* 333 F.3d at 1016 (noting that the petitioner attended weekly church services in private residences and later worked full-time at a Christian mission and authored a Christian magazine). Here, by contrast, an attack by baseball bat-wielding skinheads destroyed the makeshift synagogue at which Petitioner worshiped and left her small congregation too frightened to continue to gather. The police failed to hold the attackers responsible or to take any meaningful steps to prevent similar incidents from occurring in the future. This result amounts to a serious restriction on Petitioner's ability to practice her religion, even though the practice was not officially outlawed. *Cf. Zhang v. Ashcroft*, 388 F.3d 713, 720 (9th Cir. 2004) (per curiam) (finding a clear probability of religious persecution where a Chinese man demonstrated that he would be unable to practice Falun Gong, which is outlawed in China, without harm);[5] *Li v. INS*, 92 F.3d 985, 987 (9th Cir. 1996) (noting that an arrest at a church could have formed a basis for past persecution had the petitioner not testified that he and his family continued to worship in the church after the arrest); *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) ("If a person is forbidden to practice his religion, the fact that he is not imprisoned, tortured, or banished, and is even allowed to

---

[5]In *Zhang*, we recognized the relevance of the analysis of persecution set forth in the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status*, U.N. Doc. HCR/IP/4/Eng./REV.2 (ed. 1992) (1979) ("UNHCR Handbook"). 388 F.3d at 720. Paragraph 54 of the UNHCR Handbook states that discrimination may amount to persecution when it results in, among other things, serious restrictions on a person's right to practice his or her religion.

attend school, does not mean that he is not a victim of religious persecution."). This factor is significant in evaluating the cumulative effect of Petitioner's experiences.

Contrary to the BIA's conclusion, the record viewed as a whole compels a finding that Petitioner experienced persecution, and not merely discrimination, at the hands of anti-Semitic groups in Russia. The combination of sustained economic pressure, physical violence and threats against Petitioner and her close associates, and the restrictions on Petitioner's ability to practice her religion cumulatively amount to persecution.

**[7]** Finally, as we said in *Korablina*, "[p]ersecution may be found by cumulative, specific instances of violence and harassment toward an individual and her family members not only by the government, but also by a group the government declines to control." 158 F.3d at 1044. The fact that Petitioner's repeated requests for police intervention went ignored, along with corroborating documentary evidence that the Russian authorities have been extremely slow to respond to incidents of anti-Semitic vandalism, compels a finding that the government was unwilling or unable to control the anti-Semitic groups responsible for Petitioner's mistreatment. *Cf. id.* at 1045 (holding that the petitioner's testimony about the futility and danger in reporting violence against Jews to the Ukrainian authorities, along with corroborating documentary evidence, was sufficient to conclude that the government was unwilling or unable to control ultra-nationalist and anti-Semitic groups); *Surita*, 95 F.3d at 814 (holding that the failure of the police to investigate the robbery of the petitioner or to protect her family compelled a conclusion that the police were unwilling or unable to control the persecutors); *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir. 1996) ("Th[e] failure by the authorities to protect Singh and his family clearly indicates that the police either could not or would not control the ethnic Fijians who threatened Singh and his family.").

## CONCLUSION

**[8]** We grant the petition for review because we conclude that the record compels a finding that Petitioner suffered past persecution, entitling her to a presumption of a well-founded fear of future persecution under 8 C.F.R. § 208.13(b)(1). As the parties agree that we must under *INS v. Ventura*, 537 U.S. 12, 15-16 (2002) (per curiam), we remand for the agency to determine whether the government can rebut that presumption by a preponderance of the evidence.

PETITION GRANTED; REMANDED.