**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SILVANA DE SOUZA SILVA; GLEIDSTON MAGNO ALVES; PABLO DE SOUZA ALVES, | No. 24-834 |
| | Agency Nos. A220-643-435 A220-643-434 A220-643-436 |
| *Petitioners*, | |
| v. | OPINION |
| PAMELA BONDI, Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted March 7, 2025*
San Francisco, California

Filed June 11, 2025

Before: Kim McLane Wardlaw, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

---

* The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Opinion by Judge Paez

## SUMMARY[**]

### Immigration

The panel granted Silvana De Souza Silva's petition for review of a decision by the Board of Immigration Appeals dismissing an appeal from an order of an Immigration Judge ("IJ") denying her asylum relief.

De Souza Silva alleged past persecution and a well-founded fear of future persecution in Brazil on account of her religion, Candomblé, an Afro-Brazilian religion. The panel concluded that in determining whether De Souza Silva experienced harm rising to the level of persecution, neither the BIA nor the IJ considered the impact of De Souza Silva's past experiences on her ability to freely practice her religion. The agency's failure to consider the harm to De Souza Silva's religious practice was legal error that affected the agency's internal relocation analysis. Thus, the panel remanded for the agency to reconsider its past persecution determination and the remaining elements of De Souza Silva's claim for asylum.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jose F. Vergara, Law Office of Jose F. Vergara, Walnut Creek, California, for Petitioners.

Shahrzad Baghai, Trial Attorney; Sabatino F. Leo, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PAEZ, Circuit Judge:

Petitioner Silvana De Souza Silva ("De Souza Silva"), native and citizen of Brazil, petitions for review of a decision by the Board of Immigration Appeals ("BIA") dismissing an appeal from an order of an Immigration Judge ("IJ") denying her asylum relief.[1]  She alleges past persecution and a well-founded fear of future persecution on account of her religion, Candomblé, an Afro-Brazilian religion.

The BIA denied De Souza Silva's application for asylum, holding that she had not experienced past persecution and that she lacked a well-founded fear of future persecution because she could safely and reasonably relocate within Brazil.  But in determining whether De Souza Silva

---

[1] De Souza Silva's husband and minor son are listed as derivative beneficiaries on her asylum application.  She does not challenge the agency's denial of her applications for withholding of removal and protection under the Convention Against Torture.  She also does not challenge the agency's denial of her son's independent asylum application.  Therefore, we do not address these issues.

experienced harm rising to the level of persecution, neither the BIA nor the IJ considered the impact of her past experiences on her ability to freely practice her religion. The agency's failure to consider the harm to her religious practice is legal error and affects the agency's internal relocation analysis. Thus, we grant the petition and remand for the agency to reconsider its past persecution determination and the remaining elements of De Souza Silva's claim for asylum.

## I. Factual and Procedural Background

### A. De Souza Silva's Experiences

De Souza Silva has practiced Candomblé, an Afro-Brazilian religion, since she was a young teenager. She initially attended Candomblé ceremonies in secret; her parents were devout Catholics and did not approve of her attending these ceremonies. While attending these ceremonies, she met a woman named Simone, who eventually invited De Souza Silva to join her and her family in worship. She also met her husband this way. At age sixteen, she became pregnant with her husband's child and moved out of her parents' home to a nearby neighborhood where Simone lived.

At first, De Souza Silva and her husband did not experience problems practicing Candomblé—within a year, however, "the dirty looks started." Things turned tragic in the neighborhood when one day in 2010, individuals broke into Simone's home and murdered Simone's father because he practiced Candomblé. The intruders threatened everyone in the house and told them to move out of the neighborhood, stating that Candomblé practitioners were "witches" and "sorcerers" and not welcome in the community. Scared,

Simone and her family moved away, and she and De Souza Silva lost contact.

De Souza Silva's neighbors knew that her family was close with Simone's family and, accordingly, that she practiced Candomblé. De Souza Silva and her family soon became the main targets of increasing animus against Candomblé practitioners. Her home was frequently vandalized, with slurs and profanities, terms like "Witch" and "Sorcerers," and statements like "Get out of here" and "This is not the place for you" graffitied on her walls. At one point, De Souza Silva had to take her children out of school because they refused to attend school due to regular bullying and harassment on account of her religion.

De Souza Silva also testified that she and her husband struggled to find employment. She believed that she was denied employment opportunities because of her religion, which was well-known in the community. As she testified, "every time I would go to a job interview[,] they would know that I practiced [Candomblé], and they didn't want a person like that inside their homes, because my job [is] a maid or a cleaner." Her husband was also often looking for work but "[n]obody would hire him." As a result, there were times where her family "hardly had anything to eat."

One evening in August 2021, De Souza Silva and her family were at home getting ready to eat dinner when someone threw a large rock through their glass window, shattering it. Affixed to the rock was a written note stating that De Souza Silva and her family were not welcome in the neighborhood; it referred to her family as "wizards" and included messages to the effect of "you don't belong here" and "we will not accept you here anymore, people like you."

One month later, De Souza Silva's husband received a phone call about a job on a farm far away. As it turns out, the call was a ruse to get him out of the home at night. While he was out, a masked man with a gun broke into De Souza Silva's home. He grabbed her by the neck and put the gun against her head. He then threatened her, stating, "Witch, leave this town with your black magic family. This is just a warning. . . . Next time you won't live to see another day." He stated that if she and her family did not leave, they would be killed just like Simone's father. De Souza Silva's children woke up and, seeing what was happening, began to cry. The man ransacked their home, breaking their table, television, and mirror, before leaving. De Souza Silva, "in shock," thought she was "going to be killed right there." Soon after, she, her husband, and her youngest son fled to the United States. They left their two older children in Brazil with De Souza Silva's mother because they could not afford to bring them to the United States.

These incidents all diminished De Souza Silva's ability to practice her religion. She wrote in her asylum application that even before the final death threat, she "practiced [her] religion in hiding." Likewise, she testified that many practitioners in her neighborhood kept their religious identity "confidential." She also testified more generally that "many [Candomblé] temples are hidden" and "secret" in Brazil.

## B. Country Conditions Evidence

De Souza Silva also presented country conditions evidence regarding religious-based violence against Candomblé practitioners. The evidence explained that as evangelicalism grows in Brazil, "its most extreme adherents—often affiliated with gangs—are increasingly

targeting Brazil's non-Christian religious minorities." The "forces fueling the prejudice [in Brazil]—the historic presence of religious minorities, newly emboldened evangelicalism and lax state oversight—are particularly acute." For example, in 2019, over 200 *terreiros* (Candomblé temples) shut down in the face of threats, twice as many as the year prior. The number of reports of religious-based violence against followers of Afro-Brazilian religions also increased nearly tenfold from 2016 to 2019. According to the 2020 State Department Human Rights Report for Brazil, even though "less than 2 percent of the population followed Afro-Brazilian religions, a majority of the religious persecution cases registered by the human rights hotline involved victims who were practitioners of Afro-Brazilian religions." The 2020 State Department International Religious Freedom Report for Brazil described several media reports in which "individuals set fire to, bombed, and destroyed Afro-Brazilian places of worship, sometimes injuring or threatening worshippers."

Additionally, "Candomblecists . . . are often recognizable by their traditional garb or adornments worn on their clothes," which makes them more susceptible to verbal abuse or physical violence. "Their worship music, generally rich in percussion, also makes their ceremonies easily identifiable." In certain areas of Brazil, evangelical gangs have taken control and "shaped the daily existence of Candomblé followers," controlling "their schedule, setting a curfew, allowing religious celebrations only on certain days, [and] limiting temples to only a few visitors." Robbert Muggah, Research Director of the Igarapé Institute, has described religious-based violence against Candomblé practitioners in Brazil as the "quiet decimation of an entire community" and the "lowest of the low priorities" in Brazil.

## C. Procedural Background

After finding De Souza Silva credible, the IJ issued a decision denying De Souza Silva relief because she did not establish past persecution or a well-founded fear of future persecution. The IJ first held that the harm De Souza Silva experienced did not rise to the level of persecution. She held that the circumstances surrounding the death threat "do not indicate that the threat was credible or sufficient to cause actual suffering or harm." Further, the IJ reasoned, "[a]lthough the masked man grabbed [De Souza Silva's] neck, [De Souza Silva] did not testify to experiencing significant or lasting physical harm from this incident or requiring any medical treatment."

The IJ assigned little weight to the other harms about which De Souza Silva testified. She held that De Souza Silva's claim that she lost employment opportunities because of her religion was "speculation" and that the mistreatment of "insults, bullying, and graffiti, constitutes discrimination, rather than persecution." After concluding that the cumulative effect of De Souza Silva's maltreatment did not constitute past persecution, the IJ held that De Souza Silva also did not demonstrate a well-founded fear of future persecution because she could safely relocate within Brazil to avoid future harm.

The BIA agreed with the IJ's decision. First, it rejected De Souza Silva's contention that the IJ erred by not considering her family's past incidents of harm cumulatively. The BIA held without further analysis that the IJ's decision "reflects proper consideration of all the past maltreatment suffered by the respondents cumulatively, including the repeated offensive messages, the death threat, and economic deprivation." It accordingly affirmed the IJ's

conclusion that De Souza Silva's past experience did not rise to the level of persecution "for the reasons given by the [IJ]." Second, the BIA agreed with the IJ that De Souza Silva did not establish that it would be unsafe or unreasonable for her family to relocate to a different area of Brazil.

## II. Standard of Review

Our review is limited to the BIA's decision except to the extent that it expressly adopts the IJ's opinion. *Garcia v. Wilkinson*, 988 F.3d 1136, 1142 (9th Cir. 2021). "In reviewing the BIA's decisions, we consider only the grounds relied upon by that agency." *Id*. Where "the BIA's 'phrasing seems in part to suggest that it did conduct an independent review of the record,' but the BIA's analysis on the relevant issues is confined to a 'simple statement of a conclusion,'" we "'also look to the IJ's [] decision as a guide to what lay behind the BIA's conclusion.'" *Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010) (quoting *Avetova-Elisseva v. I.N.S.*, 213 F.3d 1192, 1197 (9th Cir. 2000)). We review factual determinations "under the deferential substantial evidence standard," and "review de novo questions of law." *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014).

## III. Analysis

### A. Persecution

"The Immigration and Nationality Act does not define persecution or specify what acts constitute persecution." *Korablina v. I.N.S.*, 158 F.3d 1038, 1043 (9th Cir. 1998). "Persecution … is an extreme concept that means something considerably more than discrimination or harassment." *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (internal quotation marks and citation omitted). In determining whether petitioners experienced persecution,

however, the agency must consider the cumulative effect of the petitioners' harms and experiences, not only whether any one harm or experience constitutes persecution. *See id.* at 1061; *Korablina*, 158 F.3d at 1044. Although persecution often takes the form of physical violence, we have recognized that other forms of harm may factor in the persecution analysis. For example, "persecution may be emotional or psychological, as well as physical," *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120 (9th Cir. 2004), and "purely economic harm can rise to the level of persecution," *Baballah v. Ashcroft*, 367 F.3d 1067, 1075 (9th Cir. 2004) (citation omitted); *see Sharma*, 9 F.4th at 1062.

"In evaluating religious persecution claims," the agency must consider "how substantially the government (or other individuals that it was unable or unwilling to control) have restrained a petitioner's practice of his or her religion." *Guo v. Sessions*, 897 F.3d 1208, 1215 (9th Cir. 2018). In this case, neither the IJ nor the BIA mentioned, let alone analyzed, the impact of De Souza Silva's past experiences—such as harassment, vandalism, and a death threat following a home invasion—on her religious practice. *See Eneh v. Holder*, 601 F.3d 943, 948 (9th Cir. 2010). The BIA held that the IJ properly considered the cumulative effect of maltreatment from "repeated offensive messages, the death threat, and economic deprivation," without mentioning De Souza Silva's ability to practice her religion freely. Indeed, in her decision, the IJ never mentioned or discussed the restrictive effects of De Souza Silva past experiences on her religious practice.

In *Krotova v. Gonzales*, 416 F.3d 1080 (9th Cir. 2005), we held that the record compelled the conclusion that Krotova experienced persecution, *id.* at 1085, emphasizing that a "serious restriction on Petitioner's ability to practice

her religion, even [when] the practice [is] not officially outlawed," is "significant in evaluating the cumulative effect of Petitioner's experiences," *id.* at 1086–87. Specifically, in *Krotova*, an attack on Krotova's synagogue "left her small congregation too frightened to continue to gather." *Id.* Likewise, in *Nagoulko v. I.N.S.*, 333 F.3d 1012, 1016 (9th Cir. 2003), we upheld the BIA's persecution decision as supported by substantial evidence only after considering the impact of Nagoulko's experiences on her religious practice. Although the police had disrupted Nagoulko's religious services before, we were reassured by the fact that Nagoulko still attended weekly church services, could work full-time at a mission to spread her religious faith, authored a Christian magazine, and worked on Christian radio and television broadcasts. *Id.* In both of these cases, the petitioner's ability to practice her religion freely was key to our decision.

We have also recognized that the "Universal Declaration of Human Rights and the Human Rights Covenant proclaim the right to freedom of thought, conscience, and religion, which right includes the freedom of a person to . . . manifest [her religion] in public or private, in teaching, practice, worship and observance." *Zhang v. Ashcroft*, 388 F.3d 713, 720 (9th Cir. 2004) (citation omitted). Accordingly, religious practice need not be officially outlawed, nor completely prevented, to be an important consideration in evaluating persecution. "[T]o require [a petitioner] to practice [her] beliefs in secret is contrary to our basic principles of religious freedom and the protection of religious refugees." *Id.* at 719.

There is ample "highly probative record evidence"—none of which was mentioned or analyzed by the IJ or BIA—that the harms and abuses De Souza Silva faced, including

harassment, recurring and escalating vandalism, and an armed death threat during a home invasion, caused her to practice Candomblé underground and eventually flee. *Flores Molina v. Garland*, 37 F.4th 626, 638 (9th Cir. 2002). In her asylum application, she wrote that even before the death threat, she "practiced [her] religion in hiding at the homes of different members." She testified that if she were to go back to Brazil, she would not be able to practice her religion "openly." She similarly testified that Candomblé practitioners in her neighborhood keep their religion confidential to avoid harm. Country conditions evidence corroborates that many Candomblé practitioners hide their religious identity from the government and that attacks against Candomblé practitioners and places of worship are common in Brazil, with over 200 Candomblé temples having shut down in the face of threats in 2019 alone.

Practicing in secret is particularly burdensome for Candomblé practice, as Candomblé practitioners wear "traditional garb or adornments" and practice through "easily identifiable" "worship music, generally rich in percussion." In fact, "music and dance" is "one of the most significant aspects of worship" to Candomblé practitioners. De Souza Silva testified that, in Brazil, she could not "live without being afraid of practicing her religion," could not "dress with [religious] colors and clothing," and felt scared that if people knew where she lived, they would cause her harm. There is no indication that the IJ or BIA considered any of this testimony or evidence in their decisions.

Relatedly, in considering whether a threat is "so menacing as to cause significant actual suffering or harm," *Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1028 (9th Cir. 2019) (citation omitted), the agency must consider how the threat impacts a petitioner's ability to practice her religion

freely. With that context in mind, the death threat De Souza Silva faced presents unique circumstances absent in *Duran-Rodriguez*, the case upon which the agency relied in denying relief. For example, unlike Duran-Rodriguez, De Souza Silva experienced a death threat explicitly linked to animus against Candomblé practitioners. The masked man specifically invoked the murder of Simone's father, who had been murdered because of his religious practice. De Souza Silva additionally experienced other harm, including escalating vandalism paired with menacing and pejorative messages. Duran-Rodriguez's family notably faced no attacks on their property. *Duran-Rodriguez*, 918 F.3d at 1028 (noting that the men "took no actions of violence against Duran-Rodriguez, his family or property"). De Souza Silva's threat also occurred against a backdrop of rising evangelicalism and violence against Candomblé practitioners and places of worship in Brazil. *See Sharma*, 9 F.4th at 1063 (explaining that "political and social turmoil in the petitioner's home country can provide relevant context for the petitioner's personal experiences").

Ultimately, in evaluating whether the cumulative effect of the harms and abuses De Souza Silva experienced rose to the level of persecution, the agency was required to consider the effect of her experiences on her ability to practice her religion freely. The agency failed to do so, never mentioning her religious practice as a consideration nor citing any of the related evidence in the record about the issue. The agency therefore committed legal error, and we remand for the agency to reconsider its past persecution decision. *See I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

## B. Internal Relocation

The BIA's internal relocation determination does not provide an independent basis for its decision and may need to be reconsidered on remand. After concluding that De Souza Silva did not experience past persecution, the BIA held that she failed to establish a well-founded fear of future persecution because she "did not establish that it is unsafe and unreasonable for [her family] to internally relocate to a different area of Brazil." However, the burden of demonstrating that relocation is safe and reasonable depends on whether De Souza Silva establishes past persecution, a determination the agency must make on remand.

On remand, if the agency determines that De Souza Silva experienced past persecution, then a presumption of a well-founded fear of future persecution arises. *See* 8 C.F.R. § 1208.13(b)(1). The presumption can be rebutted if the government shows "by a preponderance of the evidence that the applicant either no longer has a well-founded fear of persecution in the country of [her] nationality, or that [she] can reasonably relocate internally to an area of safety." *Singh v. Whitaker*, 914 F.3d 654, 659 (9th Cir. 2019); *see* 8 C.F.R. § 1208.13(b)(1)(i). Where the applicant has established past persecution, "it shall be presumed that internal relocation would not be reasonable." *Id.* § 1208.13(b)(3)(ii) (2020). This presumption applies as long as De Souza Silva establishes past persecution, regardless of whether her persecutors are government or government-sponsored actors. *See id*.

We note that in December 2020, the relevant asylum regulation was amended to create a "presumption that internal relocation would be reasonable" whenever, as is the case here, the persecutor is "not the government or a

government-sponsored actor." 8 C.F.R. § 1208.13(b)(3)(iii); *see* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274, 80,281 (Dec. 11, 2020) (describing the new internal relocation amendments). However, there is an injunction in effect preventing the implementation, enforcement, and application of the December 2020 amendments to the regulation. *See Pangea Leg. Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021); *Ullah v. Garland*, 72 F.4th 597, 603 n.3 (4th Cir. 2023). The *Pangea* "order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment[s]—is currently effective." Securing the Border, 89 Fed. Reg. 81,156, 81,171 n.79 (Oct. 7, 2024); *see Ullah*, 73 F.4th at 603 n.3.

Under the effective version of the provisions, even if her persecutors are not government or government-sponsored actors, a past persecution determination would entitle De Souza Silva to a presumption that internal relocation would be unreasonable. *See* 8 C.F.R. § 1208.13(b)(3)(ii) (2020). Accordingly, the BIA's internal relocation determination, which placed the burden of proof on De Souza Silva because of its erroneous past persecution holding, does not provide an independent basis for its decision, and remand to the agency is required.[2]

---

[2] Because remand to the agency is required, we need not address De Souza Silva's argument that in analyzing whether she faced a reasonable possibility of suffering persecution in Bahia, Brazil, the BIA failed to consider evidence of violent attacks against Candomblé practitioners and places of worship there.

For the above reasons, we grant the petition and remand to the agency for further consideration of De Souza Silva's claim for asylum.

**PETITION GRANTED; REMANDED.**