**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XIAOGUANG GU,

*Petitioner,*

v.

ALBERTO R. GONZALES,* Attorney
General,

*Respondent.*

No. 02-74417

Agency No.
A75-653-110

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 2, 2004—Pasadena, California

Filed July 21, 2006

Before: Harry Pregerson, Robert R. Beezer, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Beezer;
Dissent by Judge Pregerson

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**COUNSEL**

Joseph S. Porta, Law Offices of Cohen & Kim, Los Angeles, California, for the petitioner.

Daniel D. McClain, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, for the respondent.

**ORDER**

The panel's opinion and dissent filed December 1, 2005 and appearing at 429 F.3d 1209 (9th Cir. 2005), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

All pending Petitions for Panel Rehearing and for Rehearing En Banc are denied as moot.

---

## OPINION

BEEZER, Circuit Judge:

Xiaoguang Gu, a native and citizen of China, petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's denial of Gu's application for asylum.

We have jurisdiction pursuant to 8 U.S.C. § 1252. In view of our highly deferential review of the decisions of the Board of Immigration Appeals, we deny the petition.

I

Xiaoguang Gu entered the United States on May 9, 1998 on a business visa. His purported reason for entering the United States, and the reason American consular officials granted him a visa, was "to go on a business trip." According to Gu, a friend completed Gu's visa application and answered questions before American consular officials. Gu allowed his friend to fraudulently indicate that Gu wished to travel to the United States for a business purpose. Gu has since confessed that he actually never had any business to conduct in the United States, nor did he actually conduct any business in the United States. At his asylum hearing, Gu admitted that his true reason for coming to the United States was to more freely practice his religion. On March 23, 1999, only after overstaying his visa did Gu apply for asylum and reveal his true purpose for entering the United States.

Gu claims that he was persecuted by the Chinese government because he distributed Christian religious materials and

attended an unofficial "house church" while living in China. At his asylum hearing, Gu testified that, in October 1997, he was arrested by Chinese authorities and detained at a police station for three days. He claimed that he was interrogated for two hours, asked where he obtained the religious materials and to whom he had distributed them. After arguing that the religious materials would not disturb the society and refusing to disclose where he distributed the materials, Gu asserted that the police hit his back with a rod approximately ten times. Gu testified that he was in pain at the time and that the strikes left temporary red marks, but required no medical treatment. Gu testified that no scars, bruises, welts, or injuries of any kind remain. Gu was not interrogated further, nor does Gu assert that he was subject to further physical mistreatment.

Gu testified that he was released after three days, upon signing a letter admitting that he had "done wrong." Gu testified that he decided not to return to his home church because of fear of further police action, instead choosing to read his Bible at home. After his release, the police asked him to report to the police station once a week, but after four or five visits, the police lost interest and no longer required him to report. He was warned by his government employer that if he engaged in any additional illegal activities he would be fired, but he was allowed to return to his job as a manager for the government without any negative consequences. Gu suffered no additional problems from the government while in the country, and the Chinese government allowed him to obtain a passport to leave China.

Gu speculates that if he were to return to China, "the Chinese government will arrest me again." He states that during a phone call home in March of 1999, a friend told him not to call his family any longer because "the public security people" came to his house to look for him. Gu believes that Chinese authorities looked for him because he had sent religious materials from the United Sates to China.

After the hearing, the Immigration Judge acknowledged that Gu "has had some difficulties practicing his religion," but that he did "not believe the facts . . . rise to the level of persecution as intended by the immigration laws."[1] The BIA affirmed the Immigration Judge, concluding that "among the other issues cited in the Immigration Judge's decision, [Gu] testified that he did not experience further problems, was able to return to his government job, and obtained a valid passport to leave China."

II

A

Our review of the BIA's determination that an applicant has not established eligibility for asylum is highly deferential. We review the decision of the Board of Immigration Appeals for substantial evidence. *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992). We will affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (citation omitted). We may reverse the decision of the Board only if the applicant shows that the evidence *compels* the conclusion that the asylum decision was incorrect. *Kataria v. INS,* 232 F.3d 1107, 1112 (9th Cir. 2000); *see also Prasad v. INS,* 47 F.3d 336, 340 (9th Cir. 1995) ("Although a reasonable factfinder *could* have found this incident sufficient to establish past persecution, we do not believe that a factfinder would be compelled to do so."). This "strict standard" precludes us from "independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Kotasz v. INS,* 31 F.3d 847, 851 (9th Cir. 1994).

---

[1]The Immigration Judge also denied Gu's request for withholding of removal and protection under the Convention Against Torture. Gu did not appeal the denial of these claims to the BIA, and they are not before us.

Because the BIA's opinion denying Gu's asylum petition attributed significant weight to the Immigration Judge's findings, we "look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva v. INS,* 213 F.3d 1192, 1197 (9th Cir. 2000).

## B

**[1]** To prevail on his asylum claim, pursuant to the Immigration and Nationality Act ("Act"), Gu must establish that he is a refugee. A "refugee" is defined as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Refugee status is available if the applicant demonstrates either past persecution or a well-founded fear of persecution. *Cordon-Garcia v. INS,* 204 F.3d 985, 990 (9th Cir. 2000).

A well-founded fear of future persecution must be both "subjectively genuine" and "objectively reasonable." *Nagoulko v. INS,* 333 F.3d 1012, 1016 (9th Cir. 2003). A petitioner's credible testimony that he or she genuinely fears persecution on account of a protected ground satisfies the subjective component. *See id.* The objective component is satisfied if the applicant demonstrates past persecution, automatically giving rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). In the alternative, the objective component can be satisfied by " 'adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution.' " *Ladha v. INS,* 215 F.3d 889, 897 (9th Cir. 2000) (quoting *Duarte de Guinac v. INS,* 179 F.3d 1156, 1159 (9th Cir. 1999).

## III

We turn to analyze whether Gu has established by compelling evidence either past persecution or a well-founded fear of

persecution. We answer in the negative and conclude that the BIA's decision to deny Gu's asylum claim is supported by substantial evidence.

A

**[2]** Persecution is an "extreme concept," *Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir. 1995), and has been defined as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Singh v. INS,* 134 F.3d 962, 967 (1998) (quoting *Ghaly,* 58 F.3d at 1431) (internal citation and quotation marks omitted). Because persecution is an "extreme concept," it "does not include every sort of treatment our society regards as offensive." *Al-Saher v. INS,* 268 F.3d 1143, 1146 (9th Cir. 2001) (quoting *Ghaly,* 58 F.3d at 1431).

We have recognized that, in some circumstances, detentions combined with physical attacks which occur on account of a protected ground can establish persecution. In *Guo v. Ashcroft,* 361 F.3d 1194 (9th Cir. 2004), the asylum applicant was arrested while he was in church. During his day-and-a-half-long detention, Guo (not to be confused with Xiaoguang Gu, the petitioner in the instant case), was struck in the face, kicked in the stomach, required to perform repeated pushups and forced to sign a document saying that he promised not to believe in Christianity. *Id.* at 1197.

Less than two weeks later, Guo tried to stop a police officer from removing a cross from a tomb. The police officer used an electrically-charged baton to subdue Guo, then two police officers held his arms and kicked his legs, causing him to fall. Guo was then taken to the police station, where he was hit in the face seven or eight times and tied to a chair and beaten with a plastic pole. Guo was released after being detained for 15 days. Shortly thereafter, Guo was fired from his job because his employer claimed that he had committed a crime.

*Id.* at 1197-98. We concluded that Guo presented substantial evidence of past persecution.

We arrived at a different conclusion in *Prasad.* Prasad was taken to a police station, placed in jail, where he was hit in the stomach and kicked from behind. 47 F.3d at 339. Prasad was detained for four to six hours and interrogated about his political allegiances. Prasad did not require any medical treatment and was not charged with any crime. *Id.* Once he was released, Prasad assumed that unless he suppressed his political activities, he would again be arrested and beaten. The government, however, did not further harass Prasad, nor did the evidence indicate that it had any continuing interest in Prasad. *Id.* The Board of Immigration Appeals concluded that the conduct did not rise to the level of persecution, and we held that "[w]e are not permitted to substitute our view of the matter for that of the Board." *Id.* at 340 (citation omitted). We held that "[a]lthough a reasonable factfinder *could* have found this incident sufficient to establish past persecution, we do not believe that a factfinder would be *compelled* to do so." *Id.* (second emphasis added). The government's conduct in *Prasad* was not "so overwhelming so as to necessarily constitute persecution." 47 F.3d at 339.

The crucial difference between *Guo* and *Prasad* is whether the asylum applicant was able to demonstrate that the evidence *compelled* the conclusion that the BIA decision was incorrect. In *Guo*, the petitioner was able to show repeated, lengthy and severe harassment. In contrast, the BIA's finding in *Prasad* was supported by substantial evidence because Prasad was unable to show more than a single, isolated encounter with the authorities.

**[3]** The abuse that Gu encountered most closely mirrors the circumstances discussed in *Prasad.* Like *Prasad,* Gu was detained and beaten on only one occasion, Gu's interrogation lasted only two hours, Gu did not require medical treatment and Gu did not have any adverse employment consequences.

**[4]** The record also does not demonstrate that Gu was objectively unable to attend his household church.[2] Although Gu testified that he "did not dare" attend his household church after his arrest, he also testified that the authorities did not prevent him from attending the household church. While this somewhat conflicting testimony may demonstrate that he was subjectively unwilling to attend the household church after his arrest, the record does not demonstrate that he was unable to do so. Indeed, there is no suggestion in the record that Gu was disallowed from meeting with and discussing his religion with others or disallowed from praying or worshiping outside his home. Other than ongoing prohibition on distribution of contraband religious tracts, there is no evidence in the record regarding any state-imposed limitation on his right to practice his religion.

**[5]** On these facts, we conclude that the evidence does not compel a result contrary to the BIA's finding that Gu fails to demonstrate past persecution.

B

Since Gu failed to establish that the record compels the conclusion that Gu was subject to past persecution, we turn to consider whether Gu has independently established a well-

---

[2]The Immigration Judge erroneously stated in his decision that Gu continued to attend his house church, which is at odds with Gu's testimony to the contrary. This isolated error of the Immigration Judge proves to be of little significance, however, because we are required to look at the "record considered as a whole" in assessing whether a petitioner established eligibility for asylum. *Elias-Zacarias,* 502 U.S. at 481. Because our inquiry is based on the record as a whole, pointing out isolated errors in either the decision of the Immigration Judge or of the Board of Immigration Appeals is insufficient to show that a reasonable factfinder would be compelled to conclude that the applicant is eligible for asylum. In addition, this isolated error of the Immigration Judge is of particular insignificance given that the BIA neither explicitly adopted this portion of the Immigration Judge's decision nor mentioned this reason as a factor in support of its denial of Gu's petition.

founded fear of persecution. We conclude that the BIA's determination that Gu did not establish a well-founded fear of persecution is supported by substantial evidence.

Gu's primary support for his argument that he has established a well-founded fear of persecution is his speculation that if he returns to China, the authorities will arrest him again. As evidence supporting this theory, Gu testified that after he returned to the United States, "the local police went to [his] home and asked [his] wife to ask [him] to go back to be questioned." Apparently, Gu learned of this incident because a friend "told [him] not to call [his] family anymore because the security people came to [his] house to look for [him]." Gu testified that he believed that the "security people" would come to look for him because he sent religious material from the United States to some of his friends and fellow church members in China, although it does not appear that Gu was informed directly by either his friends or family members why the authorities came to his former residence in China.

**[6]** As a general rule, because the Immigration Judge did not render an adverse credibility finding, we must accept Gu's factual testimony as true. *Kataria,* 232 F.3d at 1114. That testimony includes hearsay evidence from an anonymous friend, who Gu says told him that public security visited Gu's residence. In the immigration context, hearsay is admissible if it is probative and its admission is fundamentally fair, *see Baliza v. INS,* 709 F.2d 1231, 1233 (9th Cir. 1983), and hearsay evidence may not be rejected out-of-hand, *see Dia v. Ashcroft,* 353 F.3d 228, 254 (3d Cir. 2003) (en banc) (holding that while hearsay evidence may be accorded less weight in immigration proceedings, "seemingly reliable hearsay evidence should not be rejected in [ ] a perfunctory manner").

**[7]** The general principle requiring the factfinder and a court of appeals to accept a petitioner's factual contentions as true in the absence of an adverse credibility finding does not prevent us from considering the relative probative value of

hearsay and non-hearsay testimony. We hold that where an asylum applicant's testimony consists of hearsay evidence, the statements by the out-of-court declarant may be accorded less weight by the trier of fact when weighed against non-hearsay evidence. *See id.*

**[8]** Pursuant to this principle, we do not question the veracity of Gu's understanding that his friend told him that members of China's public security team came to question him. By the same token, we hold that the out-of-court hearsay statement of Gu's friend is less "persuasive" or "specific," *Cardozo-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985), than a first hand account of the incident would have been.

**[9]** The record does not compel the conclusion that Gu has established a well-founded fear of persecution were he to return to China. Even after he was detained and harassed in October 1997, after several follow-up visits to the police station, Gu did not suffer further problems with the government while he was in China. Gu was not prevented from attending religious services, he was allowed to retain his government job, and he traveled freely without interference from the Chinese authorities. Because the report that Chinese authorities sought to speak with him after he left the country is the product of hearsay evidence, it is less probative of the likeliness that he would be persecuted should he return to China than this non-hearsay evidence of Gu's experiences after his detention.

Even if we were to give full weight to the evidence that the authorities looked for Gu at his former home in China, Gu did not testify that the authorities either threatened him or his family in any way. The authorities simply came to interview him. Other than this visit by the authorities to interview Gu, the record is devoid of any evidence that the Chinese authorities have shown any interest or concern in Gu's activities since shortly after his brief detention in 1997.

**[10]** Gu's testimony may be sufficient to satisfy the subjective component required to establish a well-founded fear of persecution. Gu has failed, however, to present compelling, objective evidence demonstrating a well-founded fear of persecution.

IV

**[11]** A reasonable factfinder would not be compelled to conclude that Gu either suffered past persecution or has a well-founded fear of persecution.

REVIEW is DENIED.

---

PREGERSON, Circuit Judge, dissenting:

I believe that the record compels us to find that Gu has established past persecution on account of his Christian religious practices and is eligible for asylum under 8 U.S.C. § 1101(a)(42)(A). Accordingly, I dissent.

I.   Factual Background

Gu testified that Chinese authorities persecuted him for expressing his Christian religious beliefs by attending an unregistered Christian church and by distributing Christian religious materials. According to his testimony, Gu first became interested in Christianity in October 1996, after his older sister, who resided in the United States, spoke to him about her conversion. A month later, Gu's sister began sending religious materials to him in China. She sent him additional materials in January 1997 and February 1997.

As his interest in Christianity developed, Gu began attending a government-controlled Christian church in January 1997 and was baptized there on March 16, 1997. Gu became disen-

chanted with the government-controlled church because it presented political opinions and did not adhere to the Christian gospel. Gu then began to attend a small unregistered Christian church that held services in a member's house. Gu attended services at this house church once a week and distributed copies of his sister's Christian religious materials to his fellow church members. He also distributed these materials to his co-workers at his government job.

In October 1997, Gu was arrested by public security officers and taken to the Shen Yang City Police Branch. At the police station, Gu was placed in a small interrogation room. On its walls, whips and other "things police use" were displayed. The officers interrogated Gu for two hours about the Christian religious materials he distributed. They characterized these materials as Western democracy propaganda. The officers wanted to know how Gu got the religious materials and to whom the materials were distributed. Gu argued with the officers and refused to reveal the names of the persons to whom he had given the materials. As a result, the officers beat Gu with a rod more than ten times, leaving marks on his back.

Gu was imprisoned for three days. He was conditionally released after his family posted bail. As a condition of release, Gu was required to report to the local police once a week for questioning regarding his religious activities.[1] Gu was also required to write a letter to the officers confessing that he had "done wrong" and that he agreed not to participate in any further illegal Christian religious activities. Gu agreed to write

---

[1]At the hearing before the Immigration Judge ("IJ"), government counsel asked Gu, "Were there any conditions on your release?" Gu responded, "They asked me to report to [the] local police station on a weekly basis." The majority adheres to the literal translation of Gu's words when it says that the police "asked him to report to the police station once a week." Maj. Op. at 8048. Reading the statement in context, however, Gu was not simply asked to report to the police station. Reporting to the police station was a condition of his release; Gu was *required* to report to the police station.

the confession letter only because he feared that his refusal would result in further detainment and additional beatings.

After he was released from prison, Gu stopped attending his house church and ceased distributing religious materials because he feared that he would be arrested, detained, and beaten. He felt that the only way he could safely practice his religion was to read his Bible alone at home. During Gu's weekly visits to the local public security police, he was questioned on whether he had distributed Christian religious materials or knew anyone who had. Gu made three such visits before the police told him that he no longer needed to comply with this condition of his release. Gu also returned to his government work unit, where he was put on probation and threatened with termination if he again committed similar acts.

With the help of a friend, Le Hai Hu, Gu fled to the United States on May 9, 1998. Safe in the United States, Gu began attending Christian religious services once a week. Twice he sent religious materials back to China. In March 1999, a friend living in China warned Gu to stop telephoning his family because public security officers — apparently believing Gu had returned from the United States — had visited the Gu family's home seeking to question him about the religious materials he sent to China from the United States. This warning, coupled with his earlier experiences, served as the basis for Gu's fear that he would be arrested and harshly treated by Chinese public security officers if he were forced to return to China.

After a hearing, the IJ concluded that Gu failed to establish that he was eligible for asylum. The IJ found that after his initial arrest Gu did not experience any adverse consequences at his job. Furthermore, the IJ found that Gu continued to attend his house church, receive religious materials from his sister, and practice Christianity. As discussed below, these findings are contradicted by the record. The IJ also found it important that Gu was able to obtain a passport to travel to the United

States without difficulties from the Chinese government. Ultimately, the IJ concluded that the abuse Gu endured did not rise to the level of persecution. Thus, the IJ denied Gu's request for asylum, withholding of removal, and protection under the Convention Against Torture.

The Board of Immigration Appeals ("BIA") dismissed Gu's appeal after finding that the record supported the IJ's conclusion that Gu failed to demonstrate eligibility for asylum. In support of its opinion, the BIA cited the IJ's findings that Gu experienced no further problems after his arrest, was able to return to his job, and obtained a valid passport to leave China.

II.   Treatment of Hearsay in Asylum Proceedings

I first discuss what I believe to be the most disturbing aspect of the majority's holding — its treatment of hearsay in asylum proceedings. Gu testified that Chinese security officials — believing that Gu had returned from the United States — visited Gu's family's home in China on at least one occasion since his departure. On that occasion, they were looking for Gu to question him about religious materials he sent to China from the United States. Gu received this information during a telephone conversation with a friend living in China. The majority's *sole* reason for according Gu's friend's statement less evidentiary weight is that as hearsay, it is necessarily "less 'persuasive' or 'specific' than a first hand account of the incident would have been." Maj. Op. at 8055 (citation omitted).

I am troubled by the majority's improper treatment of this testimony. By according Gu's friend's statement less evidentiary weight simply because it is hearsay, the majority contravenes the well-established law of this circuit and usurps the role of the fact finder in immigration proceedings.

It is well-settled that hearsay testimony is admissible in immigration proceedings unless its use is fundamentally

unfair to the alien. *See Cordon-Garcia v. INS*, 204 F.3d 985, 992 (9th Cir. 2000); *In re Grijalva*, 19 I. & N. Dec. 713, 721-22 (BIA 1988). Thus, in administrative proceedings, "hearsay evidence admitted without objection or later motion to strike may constitute substantial evidence in like manner *as any other evidence.*" *See Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980) (emphasis added). As this court has emphatically stated, "*it is not the hearsay nature per se of the proffered evidence* that is significant, it is its probative value, reliability and the fairness of its use that are determinative." *Calhoun*, 626 F.2d at 148 (emphasis added).

Once hearsay testimony is admitted, it may be considered and relied on by the *finder of fact*, even if it is contradicted by direct evidence. *See Richardson v. Perales*, 402 U.S. 389, 402 (1971); *see also Hayden v. Chalfant Press, Inc.*, 281 F.2d 543, 548 (9th Cir. 1960) ("It is well settled that hearsay evidence which is admitted without objection and without a motion to strike may be considered by the *trier of fact.*") (emphasis added). Accordingly, this court has long held that it is the trier of fact's duty "to consider such [hearsay] evidence and give it such weight as under all of the circumstances of the case appeared to be proper." *Hayden*, 281 F.2d at 548; *see also United States v. Weiner*, 578 F.2d 757, 770 (9th Cir. 1978) ("Once the judge determines that the hearsay evidence is admissible, the weight to be given that evidence becomes a question for the [fact finder]."). It is equally well-settled that it is inappropriate for this court to weigh evidence and determine its probative value. *See Dolliver v. United States*, 379 F.2d 307, 308 n.1 (9th Cir. 1967) ("An appellate court may not usurp the function of the duly constituted fact finder."). Even the majority recognizes that proper application of the substantial evidence standard requires us to refrain from "independently weighing the evidence." Maj. Op. at 8049 (quoting *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994)).

In this case, Gu's testimony must be taken as true. The IJ admitted Gu's testimony into evidence. We regard testimony

as reliable and credible where neither the IJ nor the BIA makes an adverse credibility finding, as was the case here. *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1038 (9th Cir. 2005) (citing *Akinmade v. INS*, 196 F.3d 951, 958 (9th Cir. 1999)) (holding that in the absence of evidence that undermines the petitioner's credibility, we accept the petitioner's testimony as true). Nevertheless, the majority holds that the hearsay statement of Gu's friend — establishing that Chinese security officials are looking for Gu — is less "persuasive" or "specific" than direct evidence would have been. Maj. Op. at 8055. Our case law, however, requires that such a determination is to be made by the fact finder in immigration proceedings. It is beyond the scope of this court's duty to reweigh properly admitted and unobjected to evidence, whether it is hearsay or not.

The fact that a particular piece of evidence is hearsay has never before played a role in this court's review of BIA decisions. *See*, *e.g.*, *Ge v. Ashcroft*, 367 F.3d 1121, 1124-25, 1127 (9th Cir. 2004) (relying in part on petitioner's hearsay testimony regarding "phone communication with his family subsequent to his arrival in the United States" to reverse an IJ's adverse credibility determination); *Hoque v. Ashcroft*, 367 F.3d 1190, 1194, 1198 (9th Cir. 2004) (holding that an administrative record that included petitioner's account of his communications with family and friends in Bangladesh after he arrived in the United States compelled conclusion that petitioner was persecuted on account of his political beliefs). Even outside of the immigration context, this court has long held that hearsay testimony, if "received without objection, [is] entitled to consideration as substantive evidence of the fact asserted, notwithstanding its hearsay character." *Cont'l Oil Co. v. United States*, 184 F.2d 802, 813 (9th Cir. 1950); *see also Pearson v. Dennison*, 353 F.2d 24, 29 (9th Cir. 1965); *Hornin v. Montgomery Ward & Co.*, 120 F.2d 500, 504 (3d Cir. 1941) ("Having been received without objection, the [hearsay] evidence, which was both relevant and material, has the value of testimony directly elicited.").

Furthermore, "this court recognizes the serious difficulty with which asylum applicants are faced in their attempts to prove persecution, and has adjusted the evidentiary requirements accordingly." *Ladha v. INS*, 215 F.3d 889, 899 (9th Cir. 2000) (quoting *Cordon-Garcia*, 204 F.3d at 992-93). Accordingly, in the asylum context, we have permitted full consideration of an applicant's testimony even if that testimony is "founded upon hearsay, and, at times, hearsay upon hearsay." *Cordon-Garcia*, 204 F.3d at 992. Disregarding clear circuit precedent, the majority discounts Gu's testimony because it is hearsay, ignoring that we have recognized that "it is difficult to imagine what other forms of testimony the petitioner could present other than his own statements . . . ." *McMullen v. INS*, 658 F.2d 1312, 1319 (9th Cir. 1981), *superseded by statute on other grounds*, 8 U.S.C. § 1253(h) (1996); *see also Cordon-Garcia*, 204 F.3d at 992-93; *Ladha*, 215 F.3d at 899-900.

The majority faults Gu for failing to provide a "first hand account" of the incident. Maj. Op. at 8055. But direct evidence that the security officials had been looking for Gu would not be "easily available" to Gu. *See Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004) (quoting *Sidhu v. INS*, 220 F.3d 1085, 1092 (9th Cir. 2000) ("[I]t is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States — such corroboration is almost never easily available.")). The majority forgets that "authentic refugees rarely are able to offer direct corroboration of specific threats." *Ladha*, 215 F.3d at 900.

The majority fails to explain why Gu's friend's hearsay statement, admitted into evidence, was unreliable or implausible. Moreover, the majority points to no evidence in the record that contradicts Gu's testimony. And neither the IJ nor the BIA questioned Gu's credibility or inquired about the whereabouts of Gu's friend, who was likely still in China.

The majority's view that reviewing appellate courts may independently devalue hearsay evidence relative to non-

hearsay evidence contravenes this circuit's well-established rule regarding the treatment of hearsay in administrative proceedings. The majority also ignores the well-recognized difficulty that asylum applicants face when seeking to prove their cases. The majority expresses this view of hearsay testimony admitted into evidence without citation to any relevant legal authority, including Ninth Circuit or Supreme Court law.

I further note that neither in their briefs nor at oral argument did either party discuss hearsay testimony. Neither the IJ nor the BIA purported to give hearsay testimony less than full weight. In addition, as the majority indicates, its discussion of hearsay testimony is extraneous to its holding. Maj. Op. at 8055 (noting that "[e]*ven if* we were to give full weight to the evidence that the authorities looked for Gu at his former home in China," the record does not "present compelling, objective evidence demonstrating a well-founded fear of persecution") (emphasis added). Thus the majority implicitly acknowledges that its assertion that "where an asylum applicant's testimony consists of hearsay evidence, the statements by the out-of-court declarant may be accorded less weight by the trier of fact when weighted against non-hearsay evidence," is dicta.

III.   Substantial Evidence and Erroneous Findings by the IJ

I disagree with the majority's conclusion that the BIA's decision is supported by substantial evidence. We must uphold the BIA's determination that an alien is not eligible for asylum only if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotations omitted). The BIA's decision must be reversed where a reasonable fact finder would be compelled to conclude, based on the evidence in the record, that there was a well-founded fear of future persecution. *Id.* at 481 n.1. The evidence here compels such a finding.

The majority opinion correctly notes that in determining eligibility for asylum, we should look at the "record considered as a whole." *Id.* at 481. The majority, however, fails to perform that analysis properly. A comprehensive examination of the record reveals that the decision to deny Gu asylum is not supported by substantial evidence. The IJ's decision is premised on erroneous findings that are contradicted by the administrative record. Moreover, rather than constituting what the majority deems "isolated errors," these mistakes go to the heart of Gu's asylum claim and undermine the BIA's denial of Gu's asylum application.

Contrary to the IJ's oral decision, Gu did not "concede[ ] that he continued to attend his unregistered church . . . without prohibition, without interruption or interference by the government . . . ."[2] Instead, the record demonstrates that the government effectively halted Gu's religious practice. After Gu was arrested and beaten, his fear of further arrests caused him to stop attending his church. Gu testified that after his arrest

---

[2]The majority downplays the IJ's blatant error by stating that the BIA "neither explicitly adopted this portion of the IJ's decision nor mentioned this reason as a factor in support of its denial of Gu's petition." Maj. Op. at 8053 n.2. Under the law of this circuit, when the BIA incorporates the IJ's decision as its own, we treat the IJ's reasons as the BIA's. *See He v. Ashcroft*, 328 F.3d 593, 595-96 (9th Cir. 2003) (examining both the oral opinion of the IJ and the written opinion of the BIA where the BIA relied on a combination of its own observations about He's testimony and "other problems noted by the IJ" when making an adverse credibility determination). In this case, the BIA did not have its own independent reasons for affirming the IJ's denial. The BIA stated:

> The record supports the Immigration Judge's conclusion that the respondent failed to demonstrate eligibility for asylum. *Among the other issues cited in the Immigration Judge's decision*, the respondent testified that he did not experience further problems, was able to return to his government job, and obtained a valid passport to leave China.

(emphasis added) (citation omitted). Thus, because the BIA did, in fact, explicitly incorporate the IJ's reasons as its own, we must also review the IJ's oral decision for substantial evidence. *See He*, 328 F.3d at 595-96.

he was *only* able to practice his religion by reading his Bible alone at home. Because Gu stopped attending his church, it is impossible to know what additional steps the public security police may have taken to stop him.

In addition, in his oral decision, the IJ stated that Gu testified that after his arrest he continued to receive religious tracts from his sister without problems from the Chinese government. This finding is directly at odds with the testimony of both Gu and his sister that she sent him religious materials in November 1996, and in January and February 1997. Based on this testimony, the last time Gu's sister sent him any religious materials was eight months *before* he was arrested and beaten by the Chinese public security police.

Finally, the IJ found it important that Gu was able to return to his government job and was not terminated after he was released from prison. This finding, however, is undercut by Gu's testimony that after he returned to that job, he was placed on probation and threatened with termination if he again engaged in such religious activities.

These erroneous factual findings are compounded by the IJ's conclusion that the public security police approved of Gu's religious activities because he was told that he no longer needed to report to the police after three weekly meetings with them. This conclusion misunderstands the reason for Gu's weekly reports, which was to confirm that Gu was complying with the police demand that he no longer participate in any illegal religious activities. And, as Gu testified, this is what he did: after his release from detention he stopped attending his Christian house church and stopped distributing religious materials. It is apparent, then, that the security police lost interest in Gu because he was no longer participating in the prohibited activities, as required by his "confession."

Similarly, the record contradicts the BIA's (and majority's) conclusion that Gu suffered no further problems with the gov-

ernment after his arrest. That the government did not continue to harass Gu after he ceased participating in the prohibited religious activities only demonstrates the success of the government's repression of Gu's Christian religious activities. The government did not try to stop Gu from attending his house church because Gu made no attempt to attend. The government made no attempt to stop him from distributing religious materials because Gu made no attempt to distribute. Gu's acquiescence in the government's repression, however, does not lead to the conclusion that he would no longer be subjected to repression if he again participated in his Christian religious activities. Indeed, Gu testified that he was threatened that if he did engage in such activities again, he would be fired from his government job.

Because Gu ceased attending his house church and distributing religious materials, we cannot know whether the government would have interfered or stopped him had he continued to do so. What we do know is that when Gu was attending church and distributing religious materials he was arrested, beaten, and detained for three days. After he ceased his Christian religious activities he was not subjected to further punishment. Mere speculation that Gu would have suffered no repercussions had he continued to pursue his Christian religious activities is not substantial evidence. *See Maini v. INS*, 212 F.3d 1167, 1173 (9th Cir. 2000) ("It is well-established that we will not uphold the BIA's determination if it relies on personal conjecture and speculation, which we have stressed is no 'substitute for substantial evidence.' "); *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996) (noting that "conjecture" cannot "substitute for substantial evidence").

When the IJ's erroneous factual findings are set aside, there remain only the IJ's findings that Gu (1) was permitted to return to his government job — where he was put on probation and threatened with termination if he engaged in Christian religious activities again — and (2) was able to obtain a

Chinese passport. Such meager findings do not constitute substantial evidence and are insufficient to support the BIA's conclusion that Gu would suffer no further problems with the government if forced to return to China.

IV.   Persecution

Because I believe that the denial of Gu's asylum claim is not supported by substantial evidence, the next step is to consider whether a reasonable fact finder would be compelled to conclude, based on the evidence in the record, that Gu has a well-founded fear of persecution. *See Elias-Zacarias*, 502 U.S. at 481 n.1. In deciding whether a finding of persecution is compelled, we look at the totality of the circumstances. *Guo*, 361 F.3d at 1203 (quoting *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998) ("The key question is whether, looking at the cumulative effect of all the incidents a petitioner has suffered, the treatment [he or] she received rises to the level of persecution.")). A well-founded fear of persecution must be both "subjectively genuine" and "objectively reasonable." *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003). Because, as the majority concedes, Gu's credible testimony that he genuinely fears persecution satisfies the subjective component, the issue here is whether Gu can satisfy the objective component by either demonstrating past persecution or by citing "credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *See Nagoulko*, 333 F.3d at 1016 (quoting *Duarte de Guinac v. INS*, 179 F.3d 1156, 1159 (9th Cir. 1999)).

A.   Past Persecution

The majority contends that the suffering endured by Gu is more closely aligned with that of the petitioner in *Prasad v. INS*, 47 F.3d 336 (9th Cir. 1995), than that of the petitioner in *Guo v. Ashcroft*, 361 F.3d 1194 (9th Cir. 2004). I disagree. The majority notes that the crucial factors differentiating *Guo* and *Prasad* are the length and the persistence of harassment.

However, the majority disregards key distinctions between the facts of *Prasad* and those in the instant case when it concludes that the evidence does not compel a finding of past persecution for Gu.

Prasad was detained for four to six hours. During that time, he was hit and kicked. Like Prasad, Gu was also arrested and beaten. However, that is where the similarities end. Prasad was hit and kicked; Gu was beaten with a rod multiple times. Prasad was detained for a few hours; Gu was detained for a substantially longer time — three days. Prasad was questioned but not threatened explicitly; Gu was interrogated about his Christian religious activities in a room where instruments of torture were displayed. Other than the arrest and beating, there were no further allegations of governmental mistreatment by Prasad.

Additionally, the majority incorrectly states that Gu did not suffer any adverse employment consequences. Gu's testimony established that after he returned to his government job, he was punished with threats of termination if he ever engaged in his Christian religious activities again. Finally, even though Gu was released from prison, his release was conditioned on his signing a "confession" promising not to engage in illegal Christian religious activities and reporting weekly to the security police.[3] The extent of Gu's suffering was sufficiently long and persistent to compel a finding of past persecution.

---

[3]The government argues and the majority agrees that denial of asylum is appropriate because Gu "at most" "only" suffered three days of detention and a beating with rods that left no scars or permanent injuries. This argument suggests that a similar claim from a frailer petitioner would succeed. The government has pointed to no authority supporting the proposition that the strength of a petitioner's application should be dependent upon his or her body's ability to withstand a severe beating. *See Mihalev v. Ashcroft*, 388 F.3d 722, 730 (9th Cir. 2004) (noting that "it would be a strange rule if the absence or presence of a broken arm were the dispositive fact").

The majority believes that Gu's testimony is somehow con-
flicting and cites this as support for denying his petition for
review. As the basis for this conclusion, the majority points
to Gu's testimony (1) that he "did not dare" attend his house
church, but (2) that he was not prevented by authorities from
attending the house church. Contrary to the majority's read-
ing, this testimony does not conflict. Rather, it is entirely con-
sistent that Gu was never *physically* prevented from attending
his house church precisely because he "did not dare" attend
it. The cumulative effects of the detention, beating, threats,
and coerced confession enabled the Chinese government to
successfully dissuade Gu from practicing his religion. When
he returned to his government job, he was put on probation
and threatened with termination if he participated in any more
Christian activities not authorized by the state. The majority
would penalize Gu for his reasonable belief that those threats,
delivered after days of detention and a beating, were genuine.
What the testimony in fact established is that the govern-
ment's actions deterred him from attending the house church;
its persecution of him was successful. No further action was
necessary.

Accordingly, I believe that Gu's credible testimony estab-
lishes that he suffered past persecution on account of his
Christian religious practices. *See Nagoulko*, 333 F.3d at 1016;
*Guo*, 361 F.3d at 1203; *see also Duarte de Guinac*, 179 F.3d
at 1161 (finding that detention combined with physical beat-
ings can establish persecution). I believe that the cumulative
treatment Gu was forced to endure compels the conclusion
that Gu suffered persecution on account of his religion, one
of the five enumerated grounds for the establishment of refu-
gee status. *See Elias-Zacarias*, 502 U.S. at 481 n.1.

B.   Objectively Reasonable Fear of Future Persecution

I disagree with the majority's conclusion that Gu does not
have an objectively reasonable fear of future persecution. As
I discussed above, because neither the BIA nor the IJ made an

adverse credibility finding, we are required to accept Gu's testimony as true, including the hearsay statement of Gu's friend. *See Smolniakova*, 422 F.3d at 1038. Gu's friend told Gu that Chinese security officials had been looking for Gu to question him about religious materials Gu sent to China from the United States. The majority ignores the context of Gu's account and belittles his experiences when it claims that the Chinese authorities "simply came to interview him." Maj. Op. at 8055. We must make "reasonable inferences" from the facts to which an alien credibly testifies. *Ladha*, 215 F.3d at 900. In this case, the visit occurred soon after Gu had sent Christian religious materials to his friends and fellow church members in China. Considering the totality of Gu's experiences — Gu's beating and detainment at the hands of security officers, the "confession" he was forced to sign; and his threatened termination — any reasonable person would infer that the "visit" to his home was not for the purpose of conducting a simple interview. Gu credibly testified that these visits serve as the basis for his fear of *arrest and detainment* upon return to China. In my opinion, Gu's fear of persecution is objectively reasonable and is supported by the evidence that public security officials have tried to locate him at his home in China. *See Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001) (holding that "even a ten percent chance of persecution may establish a well-founded fear").

In conclusion, I believe that Gu has established that his fear of future persecution on account of his Christian religion is "subjectively genuine" and "objectively reasonable." *See Nagoulko*, 333 F.3d at 1016. The BIA's decision was not supported by substantial evidence. Evidence of his past experiences and the fact that his house in China has been visited by Chinese authorities since his departure compel a finding of a well-founded fear of future persecution.

For the foregoing reasons, I dissent.