**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ZHIHUI GUO, *Petitioner*, | No. 15-70617 |
| | Agency No. A201-200-204 |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General, *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 10, 2018
Pasadena, California

Filed July 30, 2018

Before: Danny J. Boggs,[*] Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Bybee

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Immigration

The panel granted a petition for review as to the Board of Immigration Appeals' denial of Zhihui Guo's applications for asylum and withholding of removal, and denied the petition as to protection under the Convention against Torture.

Police arrested Guo for attending a Christian "home church," beat him with a baton and detained him for two days, forbade him from attending his home church, and required him to report to the police weekly to verify his compliance.

The panel held that this evidence compelled the conclusion that Guo suffered past persecution. The panel explained that in addition to the physical mistreatment, which caused Guo to seek medical attention, the police effectively prevented Guo from practicing his religion and living a Christian life. The panel remanded Guo's asylum and withholding claims for the Board to apply the rebuttable presumption that Guo will experience further persecution if returned to China.

The panel held that Guo failed to establish a clear probability of torture.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Albert S. Chow (argued), Lin & Chow, Monterey Park, California, for Petitioner.

John Frederick Stanton (argued) and Sergio Sarkany, Trial Attorneys; Kiley Kane, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

BYBEE, Circuit Judge:

Petitioner Zhihui Guo is a Chinese citizen who entered the United States in 2010 on a student visa and stayed beyond its duration. He seeks review of the Board of Immigration Appeals' ("BIA") denial of his claims for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). In mid-2010, Chinese police arrested Petitioner[1] for attending a Christian "home church," eventually beating him with a baton and detaining him for two days. Under the terms of his release, Petitioner could never again attend his home church and was required to report to the police weekly to verify his compliance.

The BIA concluded that these oppressive conditions did not rise to the level of religious persecution, portraying the harm Petitioner suffered as "a single, isolated encounter with the authorities." We are compelled to disagree. By

---

[1] We refer to Mr. Guo as "Petitioner" to avoid confusion with a case frequently cited below using the same surname.

forbidding Petitioner from attending his home church, the Chinese police prevented him from practicing his faith and did so through coercive means. The harm Petitioner suffered was therefore ongoing and, under our asylum precedent, compelled a finding of past persecution. We therefore grant the petition for review and remand to the BIA in order for it to apply the rebuttable presumption that Petitioner will experience further persecution if returned to China.

## I. FACTS AND PROCEEDINGS BELOW

Petitioner was born in 1990 in Putian, a city in China's Fujian Province. He and his mother began attending a local Christian home church in September 2009, after a neighbor began sharing her beliefs with them. The congregation was comprised of about twenty members, who would meet at the lead member's home. Petitioner and his mother attended Sunday services every week, where the congregation would sing hymns, share testimonies, and pray together.

In May 2010, five police officers entered one of these services and stated that they had received reports that the congregation was conducting illegal activities. The police confiscated the Bibles, hymn books, and religious CDs and then drove the entire group to a police station. After the group was collectively processed for several hours, the police took Petitioner to an individual interrogation room.

Two police officers then asked Petitioner why he was engaging in "anti-government" activity. He responded that his group was a church and that they were not anti-government. An officer then slapped Petitioner twice in the face. He protested this treatment, telling the officer it was illegal. The officer then took out his baton and struck

Petitioner eight or nine times on his arms, thighs, and back for one to two minutes. Afterwards, Petitioner could not stand by himself, and the officers brought him to a cell, where he remained for the next two days.

Petitioner's father eventually arrived at the station to bail him out, paying a 3000 RMB bond or fine. The police also required Petitioner to sign a "letter of guarantee," which informed him that he was not allowed to attend home church, that he was required to report to the police station once a week, and that he would be arrested for violating these release conditions.

After leaving the station, Petitioner went to a nearby hospital to be examined. The beating resulted in "many bruises" across his body and had "pierced" the skin on his back. Petitioner remained for only an hour at the hospital, where a doctor placed medication on his bruises but did not perform an X-ray. Petitioner was advised to rest for three days.

After his beating and detention, Petitioner began reporting to the police station every Tuesday. The process took approximately an hour each time, and the police would question him about his daily activities and who he had spoken with throughout the week. Officers would consistently "threaten" Petitioner and remind him that he "was not allowed to participate in the home church for Christianity anymore."

During this time, Petitioner and his family made preparations for him to leave China. He traveled at some point to Shanghai to acquire a U.S. student visa to study at a university in Utah. His father purchased an airline ticket for

him, and in December 2010, Petitioner departed China using his Chinese passport.

After arriving in the U.S., Petitioner remained in contact with his mother, who informed him that the police came looking for him at their home after he failed to report to the police station that week. Between December 2010 and May 2011, the police came to their home five or six times in search of him. His mother also informed him that several members of their former home church, including the lead member, were still in China and were required to report to the police. Petitioner's mother did not mention whether any members had been arrested again, but there is no indication that they continued to meet as a group.

After several months in Utah, Petitioner transferred to a university in California in February 2011. He became active in a church and was baptized. But unable to afford tuition, Petitioner stopped attending school after several months.

Petitioner remained in the United States without authorization, and the Department of Homeland Security initiated removal proceedings in August 2011. He conceded removability but, with the assistance of counsel, applied for asylum, withholding of removal, and CAT relief.

An immigration judge ("IJ") held a hearing in Los Angeles in December 2012, where Petitioner testified to the events above. The IJ did not make an adverse credibility finding[2] but nevertheless denied Petitioner's claims for relief.

---

[2] The credibility determination in this case is ambiguous. The IJ concluded that she had "serious questions regarding [Petitioner's] credibility and the truthfulness of his religious activities in China,

The BIA affirmed the IJ's decision, and Petitioner now seeks review before this court.

## II. JURISDICTION AND STANDARD OF REVIEW

"We have jurisdiction under 8 U.S.C. § 1252 to review final orders of removal." *Yali Wang v. Sessions*, 861 F.3d 1003, 1007 (9th Cir. 2017). Questions of law are reviewed de novo. *Retuta v. Holder*, 591 F.3d 1181, 1184 (9th Cir. 2010). "We review 'denials of asylum, withholding of removal, and CAT relief for substantial evidence and will uphold a denial supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Yali Wang*, 861 F.3d at 1007 (quoting *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014)).

"We may reverse the decision of the [BIA] only if the applicant shows that the evidence *compels* the conclusion that the asylum decision was incorrect." *Gu v. Gonzales*, 454 F.3d 1014, 1018 (9th Cir. 2006). "This 'strict standard' precludes us from 'independently weighing the evidence and

---

particularly a few major inconsistencies between his declaration and his testimony . . . ." The IJ did not, however, "believe that [there were] sufficient material inconsistencies to make a negative credibility finding under current Ninth Circuit case law." Nonetheless, she went on to explain that she had "serious concerns about the reason why [Petitioner] truly came to the United States[,]" stating that she had "doubts it was to escape religious persecution at the hand of the Chinese government." The IJ concluded that the "true reason" was to obtain educational opportunities that "would improve his future . . . ."

The BIA observed that the IJ "did not enter an explicit credibility determination on [Guo's] claim as a whole . . . ." However, it stated that it would "treat [Guo's] testimony as credible for purposes of this appeal." We do so as well.

holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown.'" *Id*. at 1018–19 (quoting *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir. 1994)). "We look at the totality of the circumstances in deciding whether a finding of persecution is compelled." *Guo v. Ashcroft*, 361 F.3d 1194, 1203 (9th Cir. 2004).

## III.  ANALYSIS

### A.  *Asylum and withholding of removal*

"To be statutorily eligible for asylum, [a petitioner] must show that he is a refugee." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1022–23 (9th Cir. 2010) (citing 8 U.S.C. § 1158(b)(1)). "A refugee is one who is 'unable or unwilling to avail himself or herself of the protection of [his or her native] country because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id*. at 1023 (first alteration in original) (quoting 8 U.S.C. § 1101(a)(42)(A)).  "The bar for withholding of removal is higher; an applicant 'must demonstrate that it is more likely than not that he would be subject to persecution' on one of" these same five protected grounds. *Ling Huang*, 744 F.3d at 1152 (quoting *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001)).  "Persecution is an extreme concept and has been defined as the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Gu*, 454 F.3d at 1019 (internal quotation marks and citations omitted).

"An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of

persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Baghdasaryan*, 592 F.3d at 1023. "If past persecution is established, a rebuttable presumption of a well-founded fear [of future persecution] arises . . . ." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (citing 8 C.F.R. § 208.13(b)(1)); *see also* 8 C.F.R. § 1208.16(b)(1)(i) (establishing the same presumption for withholding of removal).

Here, the BIA found that Petitioner's detention, beating, and release conditions did not amount to past persecution and that he could not demonstrate a well-founded fear that he would face future persecution if returned to China. The BIA therefore denied Petitioner's applications for asylum and withholding of removal.[3] As explained immediately below, we conclude that the evidence compels a finding of past persecution, thus requiring us to remand this case to the BIA in order for it to apply the presumption of future persecution.

In concluding that Petitioner did not suffer past persecution, the BIA primarily relied on our decisions in *Gu* and *Guo*—not to be confused with the petitioner of the same name in this appeal. Both cases involved claims of religious persecution in China, but only in *Guo* did we conclude that the record compelled granting the petition.

---

[3] A "failure to satisfy the lower standard of proof required to establish eligibility for asylum . . . necessarily results in a failure to demonstrate eligibility for withholding of deportation." *Halaim v. INS*, 358 F.3d 1128, 1132 (9th Cir. 2004) (quoting *Pedro-Mateo v. INS*, 224 F.3d 1147, 1150 (9th Cir. 2000)).

There, the police arrested Guo while he was attending home-church services, which they deemed an illegal religious gathering. *Guo*, 361 F.3d at 1197. After Guo asserted that he had the right to be a Christian, an officer struck him in the face twice, "ordered him to do push ups until he could no longer stand it[,]" and then kicked him in the stomach. *Id*. Guo was detained for a day and a half and released after being forced to sign an affidavit attesting that he would no longer believe in Christianity. *Id*.

A week later, Guo was visiting a congregant's tomb and witnessed a police officer removing a cross from it. *Id.* When he attempted to stop the defacement, the officer used an electric baton to subdue him. *Id*. at 1197–98. Guo was then taken to the police station, where the same officer "hit him in the face seven or eight times" and then beat him with a plastic pole. *Id*. at 1198. Guo was detained for fifteen days. *Id*. Afterwards, his employer terminated him, and he was unable to find other work in China. *Id*. Although the IJ and BIA denied Guo relief, we determined that the evidence compelled the conclusion that these detentions and beatings amounted to past persecution. *Id.* at 1203.

By contrast, we denied the petition in *Gu*, where Chinese police arrested the petitioner for disseminating Christian materials in public. 454 F.3d at 1017–18. During his interrogation, the police struck Gu in the back with a rod ten times. *Id.* at 1018. He "testified that he was in pain at the time and that the strikes left temporary red marks, but required no medical treatment[,]" and "that no scars, bruises, welts, or injuries of any kind remain[ed]." *Id*. Although Gu was required to report to the police every week for a period of time, "he did not experience further problems, was able to

return to his government job, and obtained a valid passport to leave China." *Id*.

In distinguishing these facts from *Guo*, we reasoned that "the petitioner [in *Guo*] was able to show repeated, lengthy and severe harassment." *Id*. at 1020. Gu, by contrast, "was detained and beaten on only one occasion, Gu's interrogation lasted only two hours, Gu did not require medical treatment and Gu did not have any adverse employment consequences." *Id*. Moreover, we found that the record did "not demonstrate that Gu was objectively unable to attend his household church. Although Gu testified that he 'did not dare' attend his household church after his arrest, he also testified that the authorities did not prevent him from attending the household church." *Id*. "Indeed, there [was] no suggestion in the record that Gu was disallowed from meeting with and discussing his religion with others or disallowed from praying or worshiping outside his home. Other than ongoing prohibition on distribution of contraband religious tracts, there [was] no evidence in the record regarding any state-imposed limitation on his *right to practice his religion*." *Id*. at 1021 (emphasis added).

The BIA here concluded that the instant case is more like *Gu* than *Guo* because the detention at issue "was relatively brief and [Petitioner] did not have any further interrogations or any further physical mistreatment by the police during the remainder of his detention." Although the BIA did not elaborate on why Petitioner's beating did not amount to persecution, the IJ concluded that his "treatment was less severe than that in *Guo*, as [Petitioner] was only detained for two days and hit a few times with a baton that did not leave

any lasting physical injuries."**4** The IJ also noted that Petitioner sought only minor treatment after his release and that there is "no evidence or testimony that his injuries persist . . . as a result of these incidents." Finally, while acknowledging that Petitioner was no longer allowed to attend home church, the BIA concluded that, "in contrast to *Guo*, [Petitioner] was not asked to renounce his belief in Christianity." On appeal, the government advances these same conclusions, which we find unpersuasive and unsupported by the record.

Turning to Petitioner's interrogation, the IJ's comparison of the beating he endured to the physical harm inflicted on the petitioner in *Guo* is flawed for two reasons. First, the IJ understated the severity of Petitioner's beating. Petitioner testified that the repeated baton blows to various parts of his body left him unable to stand on his own and that the officers therefore had to move him to a cell. Although he suffered no permanent injuries, Petitioner still felt it necessary to be examined at a hospital immediately upon his release, two days after the beating.

Secondly, the IJ overstated the degree of harm the petitioner in *Guo* experienced. We have explicitly rejected the implication that our decision stemmed from the severity of his beating, as "[t]here is no suggestion in *Guo* that [he]

---

**4** The government agrees that where, as here, the BIA reviewed the IJ's decision for clear error and provided more than a "boilerplate opinion," we may nevertheless look to the "IJ's oral decision as a guide to what lay behind the BIA's conclusion[s]." *Tekle v. Mukasey*, 533 F.3d 1044, 1051 (9th Cir. 2008) (alteration omitted) (quoting *Kozulin v. INS*, 218 F.3d 1112, 1115 (9th Cir. 2000)). "In so doing, we review . . . the reasons explicitly identified by the BIA, and then examine the reasoning articulated in the IJ's oral decision in support of those reasons." *Id.*

was significantly injured as a result of being hit in the face seven or eight times and beaten with a plastic pole." *Mihalev v. Ashcroft*, 388 F.3d 722, 730 (9th Cir. 2004). Moreover, a beating "may constitute persecution, even when there are no long-term effects and the [petitioner] does not seek medical attention." *Quan v. Gonzales*, 428 F.3d 883, 888 (9th Cir. 2005) (rejecting the IJ's conclusion that the petitioner's "electrocution with a rod was not sufficient to present a case of persecution, because she did not report any resulting 'medical attention or sustained injury'"). Indeed, "it would be a strange rule if the absence or presence of a broken arm were the dispositive fact" in determining whether a petitioner experienced past persecution. *Mihalev*, 388 F.3d at 730.

But we need not decide whether Petitioner's beating alone amounted to persecution because his asylum claim is also premised on his release conditions. In relying on the fact that, unlike in *Guo*, Petitioner was not forced to *disavow* his faith in writing, the BIA missed the forest for the trees; the local police forbade Petitioner from attending his home church and from thus *practicing* his religion. The *form* of persecution that the petitioners in *Guo* and in this case suffered was effectively the same: they could, in reality, continue to believe privately whatever they chose to, but were forbidden by the government from otherwise living a Christian life. In evaluating religious persecution claims, we have previously focused on how substantially the government (or other individuals that it was unable or unwilling to control) have restrained a petitioner's practice of his or her religion. *Compare Krotova v. Gonzales*, 416 F.3d 1080, 1086 (9th Cir. 2005) (finding that a petitioner's "inability to practice her religion [was] significant" in light of the fact that "skinheads destroyed the makeshift synagogue at which Petitioner worshiped and left her small congregation too

frightened to continue to gather"), *with Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir. 2003) (holding that the record did not compel a finding of religious persecution where the petitioner's "religious practice and work was not free from interruption or harassment," but she was still able to practice her faith by attending weekly home-church services and worked full time at a mission).

Further, the *degree* of religious persecution in this case is comparable to the persecution in *Guo*, where the petitioner attested that he had been "coerced to sign a paper saying that he would no longer believe in Christianity." *Guo*, 361 F.3d at 1202. Petitioner here was not forced to sign a document formally renouncing his religion, but he was forced to sign a document that informed him that he "was not allowed to participate in the home church for Christianity anymore." Moreover, the police here actively ensured that Petitioner could not practice his faith, forcing him and fellow congregants to report to the police station weekly and threatening him with arrest for noncompliance.[5] Together with the beating Petitioner suffered, there is compelling evidence of the scope and seriousness of the government's practices. Religious persecution may take different forms. We cannot meaningfully distinguish between a government forcing a petitioner to renounce his beliefs and a government forcing a petitioner to abandon his religious worship.

---

[5] During oral argument, the government asserted that Petitioner was prohibited only from attending his particular home church and that he therefore could have potentially worshiped at a church associated with a different Christian denomination. Even if true, we reject the proposition that the existence of state-sanctioned congregations—a notion antithetical to the freedom of religion—somehow mitigates the persecution that Petitioner suffered.

The government nonetheless argues that this case is more comparable to *Gu*, framing Petitioner's experience as a "single, isolated encounter with the authorities."**[6]** *Gu*, 454 F.3d at 1020. This contention disregards the reality that, because Petitioner was forbidden from attending church and required to report to the police weekly, his persecution was ongoing. Indeed, we distinguished *Gu*—where we denied the petition for review—from *Guo* on the critical point that "there [was] no evidence in [*Gu*] regarding any state-imposed limitation on [Gu's] right to practice his religion." *Id*. at 1021. Here, the opposite is true.

Finally, we acknowledge the government's submission of out-of-circuit authorities after oral argument, but we find them inapposite or otherwise unpersuasive. Of the two published decisions cited, only one addressed a claim of past persecution premised on Chinese authorities forcing the petitioner to sign a guarantee letter promising not to attend a home church.**[7]** *Xue v. Lynch*, 846 F.3d 1099, 1102, 1106–07

---

**[6]** We note that the government's approach to distinguishing *Gu* from *Guo*—one beating in the former versus two beatings in the latter—is overly formalistic and can lead to absurd results. The police beat the petitioner in *Guo* a second time only because he opposed their defacement of a Christian tomb. By contrast, Petitioner here was very likely spared a subsequent beating only because he complied with the religiously-oppressive release conditions under threat of future detention and physical harm. *Guo* does not stand for the proposition that a member of a religious minority must place himself in physical danger in order to practice or defend his faith before being able to demonstrate that he was persecuted.

**[7]** In *Ai Hua Chen v. Holder*, the petitioners did "not claim to have suffered past persecution, but [sought] asylum based on their fear of future persecution." 742 F.3d 171, 178 (4th Cir. 2014). Accordingly, the Fourth Circuit addressed only whether the documentary and testimonial evidence presented compelled the conclusion that Chinese authorities would harm

(10th Cir. 2017). In *Xue*, the Tenth Circuit primarily rejected the petitioner's proposed bright-line rule "that any time an asylum seeker was ordered, under threat of penalty, to stop practicing his religion, persecution is established." *Id*. at 1108. Petitioner here, however, does not argue for a comparable bright-line rule. And on its facts, *Xue* is distinguishable because, unlike this case, the petitioner there returned to his home church two weeks after his detention and beating without further consequences. *Id*.

Accordingly, when we consider the record as a whole, we are compelled to conclude that Petitioner suffered past religious persecution. Because Petitioner is therefore entitled to a presumption of future persecution, we will remand this case to the BIA to determine in the first instance whether the government can rebut that presumption for his asylum and withholding claims. *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir. 2004).

B.  *CAT claim*

"To qualify for CAT relief, a petitioner must establish that 'it is more likely than not that he or she would be tortured if

---

the petitioners for attending a home church. *See id*. at 183 ("Although these materials certainly reported isolated cases of official harassment, the general picture presented by both reports was simply that official treatment of Christians who attend unregistered house churches varies substantially based on locale and that such Christians in many regions practice their religion without interference."). The court therefore had no cause to consider whether being forbidden from attending a home church amounted to persecution.

We decline to address the remainder of the government's cited authorities, as they are unpublished dispositions.

removed to the proposed country of removal.'" *Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011) (quoting 8 C.F.R. § 208.16(c)(2)). "In other words, [Petitioner] 'must show only a chance greater than fifty percent that he will be tortured if removed to'" China. *Id.* (quoting *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004)). "Torture is defined, in part, as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . for any reason based on discrimination of any kind.'" *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015) (quoting 8 C.F.R. § 1208.18(a)(1)). This concept "is more severe than persecution . . . ." *Nuru v. Gonzales*, 404 F.3d 1207, 1224 (9th Cir. 2005).

Here, Petitioner merely contends that he will be arrested upon his return to China, contending that this would constitute torture. But such a summary assertion does not provide the substantial evidence—or any evidence—necessary to overcome the BIA's conclusion that he has not demonstrated a likelihood of being tortured in China. Accordingly, we deny the petition as to the CAT claim.

## IV. CONCLUSION

We **GRANT** Zhihui Guo's petition for review in part as to his claims for asylum and withholding of removal. Having determined that the record compels a finding of past persecution, we **REMAND** this case to the BIA in order for it to apply the resulting presumption of future persecution. We **DENY** the petition in part as to his CAT claim.

Costs are to be taxed against Respondent.